**AMARILLO PRODUCTION CREDIT ASSOCIATION, et al., Plaintiffs–Appellees,**

v.

**FARM CREDIT ADMINISTRATION, Defendant–Appellant.**

No. 89–1282.

United States Court of Appeals, Fifth Circuit.

Sept. 11, 1989.

Mark B. Stern and Robert S. Greenspan, Attys., Appellate Staff, Civ. Div., Washington, D.C., for defendant-appellant.

Elizabeth M. Dean and Brenda R. Cosner, Farm Credit Admin., Office of Gen. Counsel, McLean, Va., Jerry N. Smith, Harlow Sprouse, and Daniel L. Schapp, Amarillo, Tex., for plaintiffs-appellees.

Before GARZA, REAVLEY and POLITZ, Circuit Judges.

REAVLEY, Circuit Judge:

The Farm Credit Administration (FCA) denied Amarillo Production Credit Association (Amarillo), a federally chartered lending institution, permission to withdraw from the Farm Credit System (System) in order to reorganize under state law. Amarillo sought judicial review of the administrative order and injunctive and declaratory relief. The district court held that the FCA does not have statutory authority to prevent Amarillo's withdrawal from the System, and enjoined the FCA from interfering with Amarillo's reorganization. Concluding that the FCA acted within its statutory authority in prohibiting Amarillo's withdrawal, we reverse.

## I. Background

### A.

The Farm Credit System (System) is a nationwide network of federally chartered, privately held cooperative lending institutions. Established by Congress in 1916 to "improv[e] the income and well-being of American farmers and ranchers by furnishing sound, adequate, and constructive credit...." 12 U.S.C. § 2001(a), the System's lending services continue to be "essential to modern agriculture." House Report, Farm Credit Amendments Act of 1985, H.R.Rep. No. 99–425, 99th Cong., 1st Sess., *reprinted in* 1985 U.S.Code Cong. & Admin.News 2587, 2593 (hereinafter House Report).

Prior to 1988, the System was divided into twelve Farm Credit Districts. Each district had a Federal Intermediate Credit Bank (FICB), which made short and intermediate term loans to Production Credit Associations (PCAs). PCAs then loaned money directly to farmers, ranchers, and fishermen. Additionally, each district had a bank for cooperatives and a Federal Land Bank (FLB), which made long-term agri-

cultural and rural housing loans through Federal Land Bank Associations (FLBAs) in each district. *See* House Report, *reprinted in* 1985 U.S.Code Cong. & Admin. News at 2591–92. On July 6, 1988, each FLB merged with each FICB in its district to become a Farm Credit Bank (FCB). Agrigultural Credit Act of 1987, Pub.L. No. 100–233, § 410, 101 Stat. 1568, 1637 (1988) (codified at 12 U.S.C. § 2011).[1]

The system's structure has long been based on financial interdependence. The member Banks were initially supplied with start-up capital from the U.S. Treasury. House Report, *reprinted in* 1985 U.S.Code Cong. & Admin.News at 2591. System borrowers directly or indirectly have an ownership interest in the lending institutions, since borrowers must purchase voting stock in proportion to the amount loaned. *See* 12 U.S.C. §§ 2034 (omitted 1988), 2130 (amended 1988), 2094(f) (amended 1988), 2073(g) (amended 1988). Borrowers may also be required to make additional stock purchases when necessary for bank operations. *See id.* §§ 2130 (amended 1988), 2094(h) (amended 1988), 2073(g) (amended 1988). Additionally, system lending activities are funded through the sale of consolidated and systemwide notes, bonds, and discount notes (System Securities) through a service corporation that acts as a fiscal agent for all System banks. *Id.* §§ 2153 (amended 1988), 2160 (amended 1988). All banks are jointly and severally liable on System Securities. *Id.* § 2155 (amended 1988).

In recent years, a severe depression in the nation's agricultural economy precipitated a financial crisis within the System. *See* House Report, *reprinted in* 1985 U.S. Code Cong. & Admin.News at 2592–93. Concerns that investor flight would further reduce the value of System Securities prompted Congress to enact the Farm Credit Amendments Act of 1985, Pub.L. No. 99–205, 99 Stat. 1678, (codified as amended at 12 U.S.C. §§ 2001, et seq.) (hereinafter 1985 Amendments). The 1985 Amendments authorized a new entity, the

Farm Credit System Capital Corporation, to compel financially sound System institutions to transfer funds to the Capital Corporation, which could use the funds to assist troubled institutions. *See id.* § 4.28B, 99 Stat. at 1680 (repealed 1988). In 1987, the Farm Credit Act (Act) was amended again, repealing much of the 1985 Amendments. Agricultural Credit Act of 1987, Pub.L. No. 100–233, 101 Stat. 1568 (1988) (codified at 12 U.S.C. §§ 2001, et seq.).

### B.

Appellee, Amarillo, is a PCA located in the Tenth Farm Credit District. On January 23, 1986, shortly after enactment of the 1985 Amendments, Amarillo notified the FCA of its intent to withdraw from the System by means of a reorganization. Amarillo's Withdrawal Plan contemplates three steps: (1) Amarillo's assets and liabilities would be transferred to a newly-created, state-chartered association, to be called Amarillo Agricultural Credit, Inc. (AACI); (2) AACI stock would then be distributed to Amarillo stockholders in exchange for their current holdings; (3) Amarillo then would submit the PCA's charter to the FCA for cancellation. This Withdrawal Plan was approved by the Amarillo shareholders at its annual shareholder's meeting.

The FCA indicated, by letter dated February 11, 1986, that it considered Amarillo's Withdrawal Plan to be a "voluntary liquidation" within the meaning of the Act and that as such would require the FCA's consent under § 2183. After considering written submissions from Amarillo and other concerned entities and reviewing testimony on Amarillo's Withdrawal Plan, given in public hearings held in May, June, and July of 1986, the FCA issued a 22–page decision disapproving the Plan. Because Amarillo could not obtain necessary financing as a result of the FCA's disapproval, Amarillo was prevented from pursuing the reorganization.

---

**1.** The Agricultural Credit Act of 1987 amended prior provisions. Because this case was decided prior to enactment of the 1987 Amendments all references are to the earlier version unless specified otherwise.

### C.

This suit was initiated on May 1, 1986, challenging the fund transfers directed by the 1985 Amendments and seeking an injunction to prohibit any fund transfers while Amarillo pursued its Withdrawal Plan. Although that suit was mooted by the passage of the 1987 Amendments, Amarillo filed a Second Amended Complaint on April 26, 1988, which forms the basis of this action. In that complaint, Amarillo sought a declaration that its withdrawal from the System did not require FCA approval or, in the alternative, that permission to withdraw had been withheld improperly. Additionally, Amarillo sought an injunction to prevent the FCA from interfering with its Withdrawal Plan.[2]

In a non-jury trial before the district court, testimony was presented demonstrating that, prior to Amarillo's Withdrawal Plan, only one other profitable credit association had sought to leave the System and reorganize as a state-chartered institution. That occurred in 1985 when the Montana Livestock Production Credit Association (MLPCA) sought to withdraw from the System rather than participate in a district wide consolidation of the PCAs in the Twelfth Farm Credit District of Spokane.

The district court found that the FCA had treated the MLPCA's withdrawal plan as a reorganization rather than a "voluntary liquidation" and, therefore, outside the statutory consent requirements. Additionally, it found that the MLPCA was reorganized into a state lending institution with the full knowledge of the FCA but without a formal grant of consent. Since the court viewed Amarillo's reorganization plan as "virtually identical" to that of the MLPCA, it viewed the FCA's prior interpretation as relevant to the proper interpretation of the voluntary liquidation statute. Accordingly, it concluded: (1) that a corporate "reorganization" and a corporate "liquidation" are

distinct legal events; (2) that Amarillo's reorganization plan is not a "voluntary liquidation" within the meaning of § 2183; (3) and, therefore, that the FCA acted outside its then-existing statutory authority when it purportedly disapproved of Amarillo's Withdrawal Plan. We disagree with the above conclusions of law and reverse.

### II. Discussion

The question of whether the FCA acted within its statutory authority turns largely on the proper interpretation of "liquidation" as used in § 2183. While the FCA's interpretation is entitled to deference as the agency charged with the administration of the Farm Credit Act, courts are the final authorities of statutory construction. *See Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981).

Section 2183(a) provides in relevant part that

> [n]o institution of the System shall go into voluntary liquidation without the consent of the Farm Credit Administration and with such consent may liquidate only in accordance with regulations prescribed by the Farm Credit Administration.

In construing the terms of this statute, we are obligated to ascertain the intent of Congress and to give effect to that legislative intent. *See Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). To do so, we must look at the statute as a whole. *Id.* The words of a statute, unless defined, are to be given their ordinary meaning. *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). As the term "liquidation" is not defined in the Act, Amarillo cites various authorities to demonstrate that "liquidation" and "reorganization"

**2.** The 1987 Amendments added a provision specifically governing the termination of an institution's system status. Under this provision, termination is conditioned upon FCA approval and requires payment to the Farm Credit Insurance Fund, if approved. 12 U.S.C. § 2279d(a). Because Amarillo remains a member of the System and cannot now withdraw without complying with the current statute, most of the writing here is moot. The claim of improper denial of permission to withdraw may be considered as live controversy, however, and we proceed with the issues of the appeal as they are presented to the court.

each have well-defined legal meanings in corporation law.

■ The term "liquidation" refers to an entity that has wound up its affairs, paid its debts, and apportioned a loss to the shareholders so as to end the business previously carried on by that entity. *See e.g., Northwest Bancorporation v. Commissioner of Internal Revenue,* 88 F.2d 293, 296 (8th Cir.1937); *Maffia v. American Woolen Co.,* 125 F.Supp. 465 (S.D.N.Y. 1954); *Burnett v. Chase Oil & Gas, Inc.,* 700 S.W.2d 737, 740–41 (Tex.App.1985); 16A W. Fletcher, *Cyclopedia of the Law of Private Corporations,* § 7968 (rev. perm. ed.1988).

■ Conversely, a reorganization does not involve the termination of the corporate business nor liquidation and distribution. 15 W. Fletcher, *supra,* at § 7202 (rev. perm. ed.1983). Instead, a reorganization is accomplished when a new corporation is organized to continue the business of the former corporation. *See e.g., Northern Pacific Ry. Co. v. Boyd,* 228 U.S. 482, 502, 33 S.Ct. 554, 559, 57 L.Ed. 931 (1912); *Whicher v. Delaware Mines Corp.,* 52 Idaho 304, 15 P.2d 610, 612 (1932); *see also* 15 W. Fletcher, *supra,* at §§ 7201, 7202 (rev. perm.ed.1983).

■ Since Amarillo's Withdrawal Plan contemplates a transfer of assets and liabilities to a new entity and the new entity will continue Amarillo's former business, Amarillo argues that the transaction is properly characterized as a "reorganization" rather than a "liquidation." Amarillo further argues that since the Act provides the FCA with consent authority over "voluntary liquidations" but not "reorganizations," the FCA has no authority to prevent Amarillo from withdrawing from the System through a reorganization.

We are not persuaded, however, that Amarillo's Withdrawal Plan fits neatly in either category. Although there is some merit to the argument that the Withdrawal Plan is more akin to a reorganization because its business will continue after the original corporation is terminated, the primary objective is to liquidate a federal entity. While the assets and liabilities may be assumed by a state-chartered institution, that federal entity will no longer exist and its assets will no longer be subject to federal regulation. For the purposes of the System, the continued business activities are irrelevant. In the perspective of the federal source of Amarillo's charter, the proposed transaction is more appropriately characterized as a liquidation.[3]

Even if we accepted Amarillo's interpretation as technically correct, as a matter of corporation law, adopting such a construction of the statute would undermine its purposes. While legal expressions generally should be interpreted in their familiar legal sense, *Bradley v. United States,* 410 U.S. 605, 608–09, 93 S.Ct. 1151, 1154–55, 35 L.Ed.2d 528 (1973), when a technical definition is not supported by the purpose of the statute, the statutory terms should be interpreted in a manner consistent with congressional intent. *General Serv. Employees Union Local No. 73 v. National Labor Relations Bd.,* 578 F.2d 361, 366 (D.C.Cir. 1978) ("A statute is not to be read overliterally.... [A]cts of Congress must be interpreted in light of the spirit in which they were written and the reasons for their enactment.").

Under Amarillo's interpretation any PCA, prior to the enactment of the 1987 Amendments, could have reorganized outside the System without FCA approval. The structure of the System, however, does not permit such defections by the individual credit associations. While PCAs are owned and controlled by their shareholders, as part of a cooperative network of lending institutions, they are subject to FCA regulation. The Act provides that each PCA "shall continue as a federally chartered

---

3. The difficulty in characterizing the Plan contemplated by Amarillo is further demonstrated by the inconsistent terminology used by FCA employees, Amarillo disclosure statements, and documentation referring to the MCPLA Withdrawal Plan. At various times the Plans were individually referred to as a "reorganization" and at others, a "liquidation" or a "liquidation and reincorporation." Indeed, the transactions contemplated fit the liquidation-reincorporation device currently used to obtain various tax benefits. *See* 2 *Corporate Counsel's Annual–1985,* at 1454–55.

instrumentality of the United States." 12 U.S.C. § 2091 (current version at 12 U.S.C. § 2071). Any powers exercised by the association are to be included in the Articles of Association, which must be approved by the Farm Credit Administration. *Id.* Corporate activities are subject "to supervision by the Federal intermediate credit bank for the district and the Farm Credit Administration." *Id.* § 2093 (current version at 12 U.S.C. § 2073). The FCA also has the power to regulate "the borrowing, repayment, and transfer of funds and equities between the institutions of the System," *id.* § 2252(a)(6), to compel mergers of system associations, *id.* § 2183(a), and to direct changes in the governing charter of a PCA at any time in order to carry out the purposes of the Act. *Id.* § 2091 (current version at 12 U.S.C. § 2071). An unregulated right to withdraw is inconsistent with the general supervisory powers of the FCA.

Amarillo's interpretation also would undermine the purpose of the 1985 Amendments. Congress enacted these amendments to resuscitate the ailing System. The statutory scheme was based on the recognition that the System members, as private institutions, comprised an interdependent network and could be required to make payments for the common good. *See* House Report, *reprinted in* 1985 U.S.Code Cong. & Admin.News at 2599–2600. A unilateral right of withdrawal is directly contrary to the functioning of the 1985 Amendments since the enactments would have been meaningless if the financially sound institutions could remove their assets without contributing in accordance with the Amendments.

■ The district court's conclusion that Amarillo's Withdrawal Plan falls outside the statutory consent requirements apparently is based on the FCA's prior inconsistent treatment of MLPCA's withdrawal from the System. The FCA permitted the MLPCA to reorganize outside the System without formal consent and used inconsistent terminology in characterizing the transaction. Although the FCA did not issue a formal statement, it now claims that the MLPCA left the System through the "vol-untary liquidation" mechanism. The district court, however, specifically found that MLPCA's withdrawal was not treated as a "voluntary liquidation."

The district court did not indicate the legal significance of the FCA's prior inconsistent treatment with respect to MLPCA, but its conclusions suggest that either (1) it viewed the FCA's prior actions as a failure to treat the transaction as subject to its statutory consent authority, and that it is estopped from exercising any consent authority in this case; (2) it viewed the agency's actions as a de facto interpretation of the Act and binding in subsequent cases; or (3) it viewed the FCA's differing treatment as arbitrary and capricious.

First, we disagree that the FCA's actions with respect to the MLPCA constituted a failure to exercise its consent authority. Although the FCA did not formally consent to the withdrawal, the FCA was consulted and fully informed of MLPCA's plans and gave informal consent. The FCA did not oppose the MLPCA's withdrawal for several reasons. MLPCA's request was a response to a district wide consolidation in which MLPCA did not wish to participate. The Spokane FICB, MLPCA's supervisory bank, supported the withdrawal, and it was determined that no additional burdens would be placed on the district's service as a result of the withdrawal. Moreover, the use of various terms to characterize the transactions were the result of its attempt to obtain greater tax benefits for MLPCA's stockholders rather than an admission that the transaction was beyond their statutory consent authority. While the FCA's treatment of the MLPCA case may not be a sterling example of regulatory action, it does not reflect an abdication of authority, nor warrant estopping its assertion of authority in the present case.

Second, even if the FCA formerly interpreted the Act as permitting unregulated withdrawal from the System, that interpretation was incorrect and the FCA cannot be estopped from acting in accordance with the law. Furthermore, even if the FCA's former actions can be construed as an administrative interpretation, an agency,

"faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice." *American Trucking Ass'ns v. Atchison, T. & S.F. Ry. Co.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). The changed circumstances and distinguishing facts in Amarillo's case would justify a different interpretation. MLPCA's request was approved before the System's rapidly deteriorating financial status became evident and before the 1985 Amendments were passed, events that highlighted the need to regulate withdrawal of System assets. Additionally, in contrast to the MLPCA request, Amarillo's Withdrawal Plan was not supported by its supervisory bank, Texas FICB, and the FCA determined that Amarillo's withdrawal would burden the district services—two other PCAs would have to cover its area and could do so only at higher rates. Moreover, Amarillo is one of the stronger PCAs in the System and the FCA determined that withdrawal of its assets would undercut the System's ability to meet current and future demands in the Tenth District.

■ Finally, we do not find the FCA's decision and treatment of Amarillo to be arbitrary or capricious. In its decision on September 3, 1986, the FCA detailed the cooperative structure of the System, the System's deteriorating financial status, the reasons for its interpretation of the Act, the impact of the 1985 Amendments on its interpretation, the facts that distinguish Amarillo's request from that of the MLPCA, and its reasons for disapproving Amarillo's Withdrawal Plan. The treatment in this case is well-reasoned and rational and, therefore, can not be viewed as arbitrary or capricious. The documentary evidence presented points to only one conclusion: the FCA did not act arbitrarily or capriciously. The plaintiff has failed to present an issue by this record, and "we do not believe that anything could happen in the district court on remand that would change our view...." *Avoyelles Sportmen's League, Inc. v. Marsh,* 715 F.2d 897,

\* See 891 F.2d 99.

907 (5th Cir.1983); *see Sierra Club v. Sigler,* 695 F.2d 957, 981–82 (5th Cir.1983).

The district court's judgment is reversed and judgment is here rendered denying all relief to Amarillo Production Credit Association and dismissing the case.

REVERSED and RENDERED.