COLORADO SPRINGS PRODUCTION
CREDIT ASSOCIATION, et
al., Plaintiffs,

v.

FARM CREDIT ADMINISTRATION, et
al., Defendants.

SIKESTON PRODUCTION CREDIT
ASSOCIATION, et al., Plaintiffs,

v.

FARM CREDIT ADMINISTRATION, et
al., Defendants.

CHATTANOOGA PRODUCTION CRED-
IT ASSOCIATION, et al., Plaintiffs,

v.

FARM CREDIT ADMINISTRATION, et
al., Defendants.

Civ. A. Nos. 88–0574, 88–0583
and 88–0584.

United States District Court,
District of Columbia.

Feb. 25, 1991.

Barton L. Enoch, Colorado Springs, Colo., Thomas C. Seawall, Denver, Colo., Patricia D. Douglas, Washington, D.C., for Colorado Springs.

Ward & Reeves, Caruthersville, Mo., Blanton, Rice, Sidwell & Ottinger, Sikeston, Mo., Peter C. Myers, Jr., David E. Blanton, James E. Reeves, Jeffrey H. Howard, Linda E. Benfield, Miller & Chevalier, Washington, D.C., for Sikeston Production.

Carlos C. Smith, William C. Carriger, Edward D. Meyer, Chattanooga, Tenn., Jeffrey H. Howard, Linda E. Benfield, Miller & Chevalier, Washington, D.C., for Chattanooga Production.

Theodore C. Hirt, David M. Souders, Tracy L. Merritt, U.S. Dept of Justice, Civil Div., Washington, D.C. (Victor A. Cohen, FCA, McLean, Va., of counsel), for Farm Credit Admin.

D. Robert Cumming, Carey P. DeDeyn, Sutherland, Asbill & Brennan, Atlanta, Ga., Warren N. Davis, Mac Asbill, Jr., Sutherland, Asbill & Brennan, Washington, D.C., for Farm Credit System Financial Assistance Corp.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiffs bring these actions challenging the constitutionality of section 6.29 of the Agricultural Credit Act of 1987, Pub.L. No. 100–233 (Jan. 6, 1988),[1] which requires plaintiffs to make a one-time purchase of "stock" from defendant Farm Credit System Financial Assistance Corporation ("FAC"). Specifically, plaintiffs challenge the stock purchase scheme as: (1) a deprivation of property without due process in violation of the fifth amendment; (2) a taking for public use without just compensation in violation of the fifth amendment; (3) a bill of attainder; and (4) a denial of plaintiffs' rights of access to the courts. Plaintiffs' request for preliminary injunctive relief was denied on March 4, 1988. Defendants Farm Credit Administration ("FCA") and FAC thereafter moved to dismiss the complaint. Subsequently, this Court dismissed plaintiffs' bill of attainder

and rights of access claims only and invited plaintiffs to prove their allegations that the assessment formula denied them substantive due process and constituted a taking of private property for public use without just compensation. See *Colorado Springs PCA v. Farm Credit Admin.*, 695 F.Supp. 15 (D.D.C.1988) (*"Colorado Springs"*). The parties have since completed discovery, and defendants have now moved for summary judgment on the two surviving claims. For the following reasons, defendants' motions are granted.

## I. BACKGROUND

The factual background of these consolidated cases is described in detail in *Colorado Springs*. 695 F.Supp. at 17–19. Nevertheless, a brief recitation of the history of these cases is appropriate here.

The Farm Credit System ("the System"), established by Congress in 1916, is the nation's single largest agricultural lender and is comprised of 407 institutional members in twelve farm credit districts nationwide. The twelve districts have one of each of the three types of Farm Credit System Banks: (1) a Federal Land Bank ("FLB"), which makes long-term agricultural loans through the Federal Land Bank Associations ("FLBAs"); (2) a Federal Intermediate Credit Bank ("FICB") which finances short- and intermediate-term agricultural loans through the individual Production Credit Associations ("PCAs"); and (3) a Bank for Cooperatives ("BC"), which makes loans to agricultural cooperatives.[2] Although the PCAs were originally capitalized with funds from the federal government, by 1968 the PCAs had repaid the funds in full.

1. Codified at 12 U.S.C. § 2278b–9.

2. This scheme has been altered slightly since the Court decided *Colorado Springs.* Pursuant to the Agricultural Credit Act of 1987, six months after the date of enactment, the FLB and FICB in each Farm Credit District merged. The newly created entities, Farm Credit Banks ("FCBs"), are federally chartered instrumentalities with corporate powers similar to those formerly held by the FLBs and FICBs. 12 U.S.C. §§ 2011(a), 2013. In addition, within six months of the mergers, the boards of directors for the FLBAs and PCAs that are responsible for substantially

the same territory were required to submit a plan to their shareholders for merging the two associations. If the plan were approved by the district FCB, the FCA, and the stockholders, the resulting association, an Agricultural Credit Association ("ACA"), became a direct lender for both short- and long-term loans. The ACA obtains its loans from the FCB in the same manner as PCAs obtain loan funds from the FCBs. Finally, the 1987 Act gave the BCs the opportunity to merge. All BCs, except for the St. Paul BC and the Springfield BC, have merged.

System financing relies almost exclusively on private investment in Farm Credit System securities sold through the Federal Farm Credit Banks Funding Corporation ("Funding Corporation") on behalf of the System banks in the nation's money markets. The funds generated are loaned by the banks to the associations, who, in turn, loan the funds to borrowers.[3]

From 1985 to 1987, the Farm Credit System suffered significant losses due to the general economic condition of the agricultural community.[4] In an effort to ameliorate the System's poor financial condition, Congress enacted several amendments to the Farm Credit Act of 1971.

First, the Farm Credit Amendments Act of 1985, Pub.L. No. 99–205, 99 Stat. 1680–87 ("the 1985 Act"), implemented a system of compulsory transfers of funds from financially sound institutions in the System to weaker institutions in the System. These regulations were challenged by several PCAs in federal court, and the legislation was ultimately struck down.

Second, the Farm Credit Amendments Act of 1986, Pub.L. No. 99–509, 100 Stat. 1877 ("the 1986 Act"), allowed for the amortization of current losses under "regulatory" accounting principles, thereby permitting a deferral of recognition of certain losses. The 1986 Act was conceived as a temporary measure until Congress could enact more comprehensive legislation.

Finally, in 1987, Congress enacted the Agricultural Credit Act of 1987, Pub.L. No. 100–233 ("the 1987 Act"). The 1987 Act effectively dismantled the 1985 regulatory scheme and established a plan whereby a combination of funds from the System's healthy financial institutions, primarily the PCAs, and federal funds from the United States Treasury, were channeled to trou-

bled financial institutions. The 1987 Act established two new entities: (1) the Farm Credit System Assistance Board ("Assistance Board"), to provide financial assistance to threatened System institutions, and (2) FAC, to raise capital necessary for the Assistance Board. 12 U.S.C. §§ 2278a, 2278b.

FAC generates funds from two sources: an "assistance" fund and a "trust" fund. First, FAC issues up to $4 billion of debt obligations guaranteed by the United States Treasury. *Id.* § 2278b–6. This money is used to purchase stock in ailing institutions, thereby providing a "direct capital infusion" into the System. The trust fund, in contrast, is funded solely from the proceeds of a one-time purchase of FAC "stock" by the PCAs and FLBAs. Congress required each PCA to purchase stock in the amount by which its "unallocated retained earnings" exceed 13% of its assets, measured as of December 31, 1986. *Id.* § 2278b–9(a)(1)(B).[5]

The trust fund monies must be invested in United States Government securities and are used as a "capital cushion" by FAC in administering the Assistance Fund. *Id.* § 2278b–5(a)(1). Beginning five years after FAC issues the bonds to assist troubled institutions, the trust fund is available to cover any default by institutions on the payment of interest due on the bonds. The trust fund is then reimbursed by the defaulting institution, or if the institution is unable to make the payment within one year of the default, an insurance fund, also established under the 1987 Act, will reimburse the trust fund to the fullest extent possible. *Id.* § 2278b–6(d)(3)(A)(i). After fifteen years, FAC may also use the trust fund to cover defaults on the loan principal. *Id.* § 2278b–6(d)(3)(B). Upon termination

---

3. Until the late 1970s, the banks within the System issued separate bonds and notes to fund their respective operations. In 1971, Congress authorized the participating banks to issue debt securities backed by the combined financial resources of all the banks. 12 U.S.C. § 2153(d). These securities are not the obligation of or guaranteed by the United States. *Id.* § 2155(c). Rather, they are the joint and several obligations of each bank in the System. *Id.* § 2155.

4. In 1985, the System lost nearly $2.7 billion; in 1986, the System lost $1.9 billion; and in 1987, the System lost $17 million.

5. System banks were required to purchase an amount of FAC stock equal to the amount by which their unallocated retained earnings exceeded 5% of their assets. 12 U.S.C. § 2278b–9(a)(1)(A).

of FAC, any remaining money in the trust fund must be transferred to the insurance fund. *Id.* § 2278b–11(b).

Plaintiffs, several PCAs, challenge the mandatory one-time stock purchase scheme as a violation of the takings and due process clauses of the fifth amendment.[6]

## II.  DISCUSSION

Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. At the same time, however, Rule 56 places a burden on the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## A.  Fifth Amendment Substantive Due Process

▪ The stock purchase requirement of section 6.29 of the 1987 Act is a classic example of economic legislation, that is legislation that adjusts "the burdens and benefits of economic life." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). As with all economic legislation, section 6.29

"come[s] to the Court with a presumption of constitutionality, and ... the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Id.; see also Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984); *Hodel v. Indiana,* 452 U.S. 314, 323, 101 S.Ct. 2376, 2382, 69 L.Ed.2d 40 (1981). In other words, such legislation comports with due process if it bears a rational relation to a legitimate governmental purpose. *Regan v. Taxation with Representation of Washington, D.C.,* 461 U.S. 540, 547, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 83–84, 98 S.Ct. 2620, 2635–36, 57 L.Ed.2d 595 (1978). Clearly, the party "challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 950, 59 L.Ed.2d 171 (1979).

In considering whether section 6.29 passes constitutional muster, the Court recognizes that Congress has "absolutely no obligation to select the scheme that a court later would find to be the fairest, but simply one that was rational and not arbitrary." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 477, 105 S.Ct. 1441, 1458, 84 L.Ed.2d 432 (1985); *see also Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978) (the "Due Process Clause does not empower the judiciary 'to sit as a superlegislature to weigh the wisdom of legislation'") (quoting *Ferguson v. Skrupa,* 372 U.S. 726, 731, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963)). In other words, the fact that another rational formula, perhaps even a more rational formula, for financing

---

6. Plaintiffs in Civil Action No. 88–0574 ("Colorado Springs plaintiffs") are located in the Ninth Credit District; plaintiffs in Civil Action No. 88–0583 ("Sikeston plaintiffs") are located in the Sixth Farm Credit District; and plaintiffs in Civil Action No. 88–0584 ("Chattanooga plain-

tiffs") are located in the Fourth Farm Credit District. In total, plaintiffs constitute 20 of the approximately 100 PCAs of the Farm Credit System. Plaintiffs in these three consolidated actions will be referred to collectively as "the PCAs," except where their arguments diverge.

the trust fund exists does not compel a finding that the assessment pursuant to section 6.29 denies plaintiffs their rights to substantive due process.

Plaintiffs concede that providing financial assistance to Farm Credit System institutions is a legitimate governmental goal, and they do not object to the creation of the trust fund *per se.* In fact, the trust fund serves a number of legitimate governmental purposes. For example, because it is available to cover defaults on FAC bonds by System institutions on the payment of interest due on FAC bonds during the first fifteen years after the issuance of such bonds, it promotes investor confidence in the bonds.[7] The FAC bonds are backed by the full faith and credit of the United States, and thus the trust fund provides the initial line of protection for the United States Treasury and the taxpayer in the event of a System default on either interest or principal. Similarly, the trust fund may provide money for the insurance fund, thereby ensuring the timely payment of principal and interest on obligations issued by System banks. Under 12 U.S.C. § 2155(a), each System bank is jointly and severally liable on all System obligations, and effective in January 1993, the insurance fund must be exhausted before the banks are held jointly and severally liable. 12 U.S.C. § 2155(d). Thus, the existence of the insurance fund protects the System banks, ultimately to the benefit of the PCAs.

Although plaintiffs recognize the values of the trust fund, they challenge the scheme established by Congress for funding the it; plaintiffs contend that the mandatory one-time stock purchase plan, articulated in section 6.29, is not rationally related to the legitimate purpose of revitalizing the System. None of plaintiffs' objections to the assessment formula, however, persuades the Court that section 6.29 denies plaintiffs' substantive due process.

First, plaintiffs argue that the ratio of unallocated retained earnings to assets does not bear a rational connection to plaintiffs' prior conduct or to their anticipated future benefits from System membership or from the 1987 Act. In addition, plaintiffs assert that because all System institutions share benefits under the Act, regardless of the amount of the assessment paid, the benefits are inversely related to the amount of the assessment paid. Declaration of J. Bruce Bullock, Associate Director of the Agricultural Experiment Station, University of Missouri, attached as Exhibit 2 to plaintiff Chattanooga's Opposition to the Motions for Summary Judgment ("Bullock Decl.") ¶¶ 37–42, 63.

Plaintiffs' initial argument is flawed for several reasons. There is no requirement that the burden imposed by legislation be exactly proportionate to the benefits received. *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491 n. 21, 107 S.Ct. 1232, 1246 n. 21, 94 L.Ed.2d 472 (1987). Moreover, it is undisputed that in enacting the 1987 Act, Congress sought to spread fairly the burden of preserving the System among the participating institutions based on some reasonable measure of their financial strength. Indeed, it would have been arbitrary for Congress to have assessed institutions without regard to their financial condition, for then Congress may have harmed the very institutions it was seeking to assist. Thus, it was rational for Congress to devise a formula that assessed financially sound institutions more than financially weak institutions.

In an effort to illustrate the irrationality of the section 6.29 assessment scheme, plaintiffs propose an alternative formula based on loan volume, which, they contend, would have assessed the institutions more fairly. Bullock Decl. ¶¶ 44–45. That plaintiffs' proposed formula based on loan volume may be rational is beside the point. It is simply insufficient as a matter of law for plaintiffs to establish a reasonable dispute over the plainly rational means chosen by Congress to effect a legitimate legislative objective.

---

7. The FAC bonds, although guaranteed by the United States Treasury, are not direct obligations of the United States.

Next, plaintiffs contend that the formula devised by Congress is irrational because the ratio of unallocated retained earnings ("URE") to assets is not a "reliable" measure of the financial strength of a PCA. Unallocated retained earnings, however, are an institution's surplus capital and include neither the surplus funds a System institution reserves to cover future loan losses nor the funds necessary to cover an institution's stock, participation certificates, allocated equities or operating expenses. In effect, the amount of URE is evidence of an institution's ability to absorb losses without impairing borrower stock.

Plaintiffs recognize that URE reflect the institution's resources that are available to absorb losses prior to the impairment of capital stock, but they dispute whether these earnings adequately reflect the health of a financial institution. Bullock Decl. ¶ 19. Although in some cases high URE may be misleading—for example, if a PCA experiences a precipitous decline in loan volume—it is equally clear that such earnings could reflect the strength of a financial institution. Under the standard that this Court must apply, it was rational for Congress to conclude that institutions with a substantial level of unallocated retained earnings could better absorb the impact of a one-time stock purchase and were financially sound.[8]

Plaintiffs also object to the use of a date certain, December 31, 1986, for measuring the unallocated retained earnings because, they claim, use of that specific date resulted in an overstatement of excess surplus. Bullock Decl. ¶ 43. Defendants, however, justify their decision on two bases. First, year-end System financial statements are audited by an independent accountant, thereby resulting in precise calculations. *See* 12 C.F.R. § 621.9. Second, Congress was concerned that using a prospective date, year-end 1987 for example, would allow institutions to make unwise management decisions or manipulate their financial statements in order to minimize their contributions under the Act. Deposition of Charles O. Sethness, former Assistance of the Treasury for Domestic Finance, Feb. 15, 1989, excerpted in Exhibit 2 of federal defendant's Exhibits in Support of its Motion for Summary Judgment ("Sethness Dep."), p. 135.[9]

In any event, plaintiffs do not dispute defendants' assertions that the amounts actually assessed do not differ materially from the amounts that would have been assessed under plaintiffs' proposed formula based on averages over several quarters. Indeed, the amount of the stock purchase imposed on a majority of the plaintiffs would have been even larger had the required purchase been based on the average of the URE and assets at the end of the third and fourth quarters of 1986 and the first and second quarters of 1987. Declaration of P. Robert Dougherty, former Senior Vice President of the Farm Credit Banks of Baltimore, attached as Exhibit J to Exhibit 5 of defendant Farm Credit System Financial Assistance Corporation's Motion for Summary Judgment ("Dougherty Decl.").

Plaintiffs further contend that the formula is irrational because it requires PCAs to pay the amount by which their unallocated retained earnings exceed 13% of their assets, while System banks are required to pay the amount by which their unallocated retained earnings exceed 5% of their assets. Congress had determined, however,

---

8. Again, plaintiffs contend that a formula based on loan volume would provide more reliable and rational indications of the strength of the System's institutions. Nonetheless, it is not the Court's function to determine the most reliable method of calculating an institution's financial strength and thereby reject as constitutionally infirm another reliable, rational, and fair formula.

9. Due to declining loan volumes and total assets in 1987, the choice of December 31, 1986 as opposed to December 31, 1987 resulted in a lower amount on average of stock purchase required of System institutions. *See* Sethness Dep., pp. 133–34; Deposition of Dudley L. Carmical, President, Delta PCA, Feb. 3, 1989, excerpted in Exhibit 30 of federal defendant's Exhibits in Support of its Motion for Summary Judgment ("Carmical Dep."), p. 107; Deposition of Robert A. Wright, President, Sikeston PCA, Feb. 2, 1989, excerpted in Exhibit 14 of federal defendant's Exhibits in Support of its Motion for Summary Judgment ("Wright Dep."), p. 42.

that PCAs experience higher risk than the banking industry, and it was not irrational for the PCAs to be permitted to retain more earnings, thereby leaving the PCAs with an adequate cushion of surplus capital over and above the borrower stock.

Lastly, plaintiffs assert that the statute is irrational because the 13% figure was arbitrarily chosen in order to keep the $4 billion in assistance "off-budget;" this goal, plaintiffs argue, is not a legitimate governmental objective.

That the off-budget status of the funds was reached as a part of a political compromise which sought to minimize the effect of the legislation on the budget does not mean that the Act was irrational. *See Lyng v. International Union, United Auto., Aerospace and Agricultural Implement Workers of Am.*, 485 U.S. 360, 373, 108 S.Ct. 1184, 1193, 99 L.Ed.2d 380 (1988) (protecting the fiscal integrity of government programs and of the Government as a whole is a legitimate concern of the State, and courts should be deferential to Congress in matters concerning how best to allocate limited budget resources). Moreover, keeping the $4 billion in assistance off-budget was but one purpose of the trust fund. Congress had several critical objectives in establishing the trust fund: furnishing protection for the United States Treasury in the event of a System default on the principal or interest due on FAC bonds and providing additional funds for the insurance fund. Finally, Congress' goal in keeping the assistance package off-budget not only was legitimate, but also was important to the passage of the 1987 Act. Congress disapproved of the System receiving taxpayer assistance before the System itself contributed to the maximum extent possible.[10] *See* 133 Cong.Rec. S16916 (daily ed. Dec. 2, 1987) (statement of Senator Lugar); 133 Cong.Rec. S16962

(daily ed. Dec. 2, 1987) (statement of Senator McClure ("This bill emphasizes that the Farm Credit System must help itself as a condition of taxpayers assistance."); 133 Cong.Rec. S16967 (daily ed. Dec. 2, 1987) (statement of Senator Kassebaum) ("[W]e must minimize taxpayer and treasury exposure.").

For the foregoing reasons, the Court finds that the mandatory one-time stock purchase scheme was rationally related to the legitimate purpose of revitalizing the Farm Credit System. Accordingly, defendants' motions for summary judgment on plaintiffs' substantive due process claim are granted.

### B. Fifth Amendment Taking Clause

The taking clause of the fifth amendment provides that "private property [shall not] be taken for public use, without just compensation." Here, plaintiffs maintain that the forced purchase of valueless stock constitutes an impermissible taking.[11]

### C. Legal Test

The Court previously ruled that the framework of *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), which applies to "regulatory takings," controls the analysis in the instant cases. *Colorado Springs*, 695 F.Supp. at 20 & n. 17. As a preliminary matter, however, plaintiffs ask the Court to reconsider its ruling that the *Connolly* framework applies, arguing that these actions fall within the *"per se* takings"* (occasionally referred to as "property condemnation") line of cases. *See Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *First English Evangelical Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987); *FCC v. Florida Power Corp.,* 480

---

**10.** In fact, without the off-budget status of the assistance package, it appears unlikely that the legislation would have passed the Agriculture Committee or the Senate and highly probable that other agricultural budgets would be cut under the Gramm–Rudman–Hollings Act if the funds were considered on-budget.

**11.** Although plaintiffs' arguments on behalf of their takings claim have been carefully considered, the Second Circuit's suggestion that a takings analysis may add little when a statute survives an attack under the due process and contracts clauses is instructive. *See Pineman v. Fallon,* 842 F.2d 598 (2d Cir.), *cert. denied,* 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 48 (1988).

U.S. 245, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).[12]

The Court's original determination that a regulatory takings analysis controls this case shall be maintained. The Supreme Court recently reversed the Federal Circuit in *Sperry Corp. v. United States*, 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989), and, *inter alia*, specifically rejected Sperry's contentions that the deduction of a monetary amount was akin to a "permanent physical occupation" of the plaintiff's property and thus a *per se* taking under *Loretto*.[13] *Id.* 110 S.Ct. at 395 n. 9. Here, too, plaintiffs do not present a permanent physical occupation of their property; rather, they claim they have been required to spend large sums of money to purchase valueless stock. Therefore, under *Sperry* and its progeny,[14] the Court must make "ad hoc, factual inquiries" into the circumstances of these cases. *Connolly*, 475 U.S. at 224, 106 S.Ct. at 1025. Pursuant to a *Connolly* analysis, three factors in particular must be examined: (1) the economic impact of the regulation on the claimants; (2) the extent to which the regulation has interfered with plaintiffs' distinct investment-backed expectations; and (3) the character of the governmental action. *Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026 (citing *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)).

**12.** The *per se* takings cases hold that the multifactor test articulated in *Connolly* does not apply when there is "a permanent physical occupation" of property. *See Loretto*, 458 U.S. at 434–35, 102 S.Ct. at 3175.

**13.** In their original briefs, plaintiffs relied heavily on *Sperry Corp. v. United States*, 853 F.2d 904 (Fed.Cir.1988). In fact, plaintiff Colorado Springs noted, "[T]he case before this Court involves exactly the same kind of taking [as in *Sperry*]: the permanent deprivation of Plaintiffs' money." Colorado Springs Opposition, p. 13.

**14.** The Federal Circuit has since taken note of *Sperry*. In *Atlas Corp. v. United States*, 895 F.2d 745 (Fed.Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990), a number of corporations that entered into contracts with the government for the production of uranium and thorium challenged the Uranium Mill Tail-

### 1. *Economic Impact*

■ A determination of the economic impact of the stock purchase requirement "is not made in a vacuum." *Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026. Rather, the court must consider whether "there are a significant number of provisions in the Act that moderate and mitigate the economic impact" of the statute at issue. *Id.*

Defendants concede that the stock purchase requirement forced plaintiffs to buy valueless stock and thus is, in reality, an assessment. They further note that the requirement has had a direct adverse effect on plaintiffs in two ways. First, plaintiffs have reduced their earnings by recording the assessments under section 6.29 as expenses. Second, because plaintiffs had to borrow funds to pay the assessments, their future earnings will be reduced in the amount of the interest on the borrowed funds until the loans are repaid.

However, defendants also focus on a number of factors that suggest that the economic impact was not so severe as to render section 6.29 unconstitutional: (1) plaintiffs are able to make loans at competitive rates; (2) plaintiffs are ongoing financial institutions; (3) none of the plaintiffs has needed or requested financial assistance from the Assistance Board; (4) plaintiffs' 1988 annual reports to stockholders generally indicate that despite the impact of the assessment on operations, they ex-

ings Radiation Control Act, Pub.L. No. 95–604, 92 Stat. 3021 (Nov. 8, 1978) and its regulations, which required plaintiffs to undertake costly measures to stabilize uranium residue and to decontaminate and reclaim uranium and thorium mill sites. One plaintiff, Western Nuclear, argued that the large expenditures, which exceeded the cost of its mill, constituted an unconstitutional taking. The court noted that Western Nuclear had not alleged a physical taking of any of its property; rather, its complaint alleged only that it would be required to spend certain sums of money. Citing the Supreme Court's decision in *Sperry*, the Federal Circuit noted that "[r]equiring money to be spent is not a taking of property," and therefore applied the three-factor *Connolly* test to analyze the taking claim. *Id.* at 756 (citing *Sperry*, 110 S.Ct. at 395 n. 9.).

pect to provide credit on reasonable and competitive terms in the future; (5) virtually all plaintiffs enjoyed increased loan volume in 1988, and none has asserted any significant loss of borrowers; (6) the ratios of plaintiffs' URE to their total assets as of December 31, 1988 compare favorably with ratios of most other System institutions; (7) plaintiffs significantly exceed FCA's new minimum capital adequacy requirements; and (8) plaintiffs are able to obtain the funds necessary to meet their borrowers' credit needs from their respective banks.

Plaintiffs rely principally on the declaration of J. Bruce Bullock in an effort to show that defendants' measures of financial health are fundamentally flawed and that the assessments have had a significant impact on their businesses. Mr. Bullock contends that the only way to determine economic viability is to examine a business' profitability over time; and he, therefore, argues that the proper method for determining the viability of the PCAs is to examine the present value of the institution's income stream over a five-year period. Bullock Decl., ¶ 17.

The Court, however, has already accepted defendants' arguments that URE reflect the resources of an institution available to absorb losses prior to the impairment of capital stock and thus are relevant indicators of an institution's financial health. The other two measures of financial strength that Mr. Bullock also dismisses as having no necessary relation to the ability of a PCA to generate income are net interest margin and the ratio of risk funds to gross loan volume. Bullock Decl., ¶¶ 12, 24–25. The Court agrees with defendants, however, that other portions of Mr. Bullock's own declaration refute his criticism of these two measures. In fact, Mr. Bullock's "benefit index"—an index designed to demonstrate that the assessed PCAs are the

least likely institutions to require or receive direct financial assistance—is based solely on these two indicators. See Bullock Decl., ¶¶ 12, 37–42.

It is interesting to observe that plaintiffs have also received numerous benefits from the 1987 Act. First, by materially increasing investor confidence in the System, the 1987 Act caused a significant reduction in interest on Systemwide debt from the rates that would have been imposed had the 1987 legislation not been enacted. The 1987 Act also greatly reduced the risk that the PCAs largest single asset—their investments in the FCBs—would be diminished or lost because of the System's problems. Further, the 1987 Act enables all System institutions, including the plaintiffs, to apply for direct federal financial assistance, to be funded by FAC, in the event of stock impairment. 12 U.S.C. § 2278a–4. Finally, the banks of plaintiffs Colorado Springs, Sikeston, and Chattanooga were paid $16.5 million, $18.4 million, and $39.7 million, respectively, for prior Capital Preservation Agreement accruals.

Plaintiffs recognize that the 1987 Act "has made a positive contribution to the future economic viability of the Farm Credit System" (Bullock Decl. ¶ 29), but they summarily dismiss the benefits they have received because such benefits have also been enjoyed by other System institutions. The Court cannot accept this contention. Benefits actually inuring to plaintiffs in the present case would not be irrelevant merely because they are not unique to them. Balancing the conceded economic impact on plaintiffs against the mitigating factors codified in the 1987 Act, the Court finds that plaintiffs cannot show economic harm sufficient to support a determination that a taking has occurred.[15]

### 2. Investment–Backed Expectations

The second inquiry the Court must make in determining whether the assessment un-

---

**15.** See *Atlas,* 895 F.2d at 758 (because Western Nuclear had not claimed that the government interfered with its production of uranium or made the use of its mill unprofitable, there was no economic impact that would support a determination that a taking occurred); *Meier v. Anderson,* 692 F.Supp. 546, 554–55 (E.D.Pa.

1988) (payment of almost 50% of doctor's gross income held insufficient), *aff'd mem.,* 869 F.2d 590 (3d Cir.1989); *Case v. United States Dep't of Agriculture,* 642 F.Supp. 341, 343–44 (M.D.Pa. 1986) (95% diminution of sales which "destroyed plaintiffs' business" held insufficient), *aff'd,* 829 F.2d 30 (3d Cir.1987).

der section 6.29 constitutes a taking is whether the legislation interfered with plaintiffs' reasonable investment-backed expectations. In *Connolly*, the Supreme Court noted that there is no interference with investment-backed expectations if plaintiffs have been on notice for a reasonable time that Congress may take action affecting the use of their property. As the Supreme Court explained, " '[L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.... This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.' " *Connolly*, 475 U.S. at 223, 106 S.Ct. at 1025 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976)).

Defendants contend that plaintiffs were on notice that in the event of financial stress threatening the very existence of the Farm Credit System, they might be called upon to bear additional financial obligations for the benefit of the System as a whole. In contrast, plaintiffs contend that they could not have expected to have been assessed for the losses of other System institutions.

The extensive supervision and control of the PCAs and the interdependent structure of System lends support for defendants' arguments. The Supreme Court has suggested that one factor relevant to a determination that plaintiffs were on notice is whether the industry of which they are a part is regulated. As stated in *Connolly*, " 'Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent Amendments to achieve the legislative end.' " 475 U.S. at 227, 106 S.Ct. at 1027 (quoting *FHA v. Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958)). Here, the plaintiff PCAs are an integral part of the Farm Credit System lending structure. As such, they are extensively regulated by the FCA and supervised by the district banks. 12 U.S.C. § 2073.

The fact that the PCAs are part of an interdependent structure lends further support for the position that plaintiffs could have expected to have been assessed for the benefit of the System as a whole. As the Court of Appeals for the Eighth Circuit suggested, "Each PCA is not an independent, autonomous venture entitled to operate as it pleases under the terms most favorable to its own borrowers regardless of the interests of the whole system." *Bailey v. Federal Intermediate Credit Bank*, 788 F.2d 498, 502 (8th Cir.), *cert. denied*, 479 U.S. 915, 107 S.Ct. 317, 93 L.Ed.2d 290 (1986). Similarly, the Court of Appeals for the Fifth Circuit recently recognized the inter-relatedness of PCAs in the System as a PCA was prohibited from unilaterally withdrawing from the System. As the Court there noted:

> The statutory scheme was based on the recognition that the System members, as private institutions, comprised an interdependent network and could be required to make payments for the common good.... A unilateral right of withdrawal is directly contrary to the functioning of the 1985 Amendments since the enactments would have been meaningless if the financially sound institutions could remove their assets without contributing in accordance with the Amendments.

*Amarillo PCA v. Farm Credit Administration*, 887 F.2d 507, 512 (5th Cir.1989).

Moreover, statutes, regulations, and other governmental actions provided continuing notice to plaintiffs of the possible burdens they could be forced to bear on behalf of the System. The 1985 Act, for example, put plaintiffs on notice that Congress asserted the authority to provide for the assessment of the PCAs' surplus. Although the 1985 Act was held unconstitutional as applied to certain plaintiffs, and the enforcement of the 1985 Act as to those plaintiffs was permanently enjoined, not one case that examined the 1985 Act or the regulations promulgated thereunder held that Congress lacked constitutional authority to assess a PCA's surplus.

Moreover, events prior to the 1985 Act made plaintiffs clearly aware that they might experience additional financial obligations. As early as 1965, Congress autho-

rized participating FICBs to require their affiliated PCAs to subscribe to and pay for additional stock in the banks to satisfy the FCIBs' capital needs. Pub.L. No. 89–237, 79 Stat. 922, §§ 1(b), 1(c)(ii). Although this "capital call" statute may never have been invoked as to plaintiffs and may not have required the PCAs to give up something (money) for nothing (valueless stock) as is the case here, plaintiffs were surely informed by this governmental action that Congress considered it had the power to assess the PCAs. Similarly, in 1971, Congress made all the banks jointly and severally liable for the repayment of the principal and interest on securities. Pub.L. No. 92–181, 85 Stat. 611, §§ 4.2(d), 4.4. By this action, Congress effectively authorized the System banks to expose the URE of PCAs in one district to the financial difficulties experienced by the banks in their own or other districts.

Plaintiffs concede that in the mid–1980s, System institutions suffered massive losses. They concede further that, as a result of these losses, the fundamental risk facing the System was that the banks might default on the existing systemwide bonds and thus be denied access to the money markets altogether. It defies logic to contend that Congress, having put PCAs at risk in connection with bank debt, would either refrain from requiring the PCAs to contribute to averting such a crisis, or be without authority to do so.

### 3. *Character of Governmental Action*

In accordance with the regulatory takings analysis articulated in *Connolly,* the Court must finally consider the character of the governmental action. In *Connolly,* it was found that the government had not appropriated any of the employers' assets for its "own use," but, rather, had acted to safeguard the participants in multi-employer pension plans. 475 U.S. at 225, 106 S.Ct. at 1026. The appropriation was not considered a taking.

Here, too, there has been no physical invasion or permanent appropriation of assets for the government's own use. The $177 million raised by the assessment will be used to satisfy the obligations of System institutions, initially by paying interest and principal to the holders of FAC debt obligations, and then, by putting the remaining monies in the insurance fund. Moreover, as a result of the 1987 Act, a number of System banks have received direct financial assistance, and in each instance, save one, the Assistance Board provided substantial sums to prevent stock impairment.[16] As a result of the governmental aid, there was no need to trigger the joint and several liability provisions of the 1987 Act.

Plaintiffs nevertheless argue that because the full faith and credit of the U.S. Treasury guarantees the payment of all principal and interest on the $4 billion in bonds issued, and because the assessment reduced the risk that the Treasury would have to incur liability under its guarantee, the government had appropriated plaintiffs' property for its "own use." Plaintiffs' arguments are, however, legally deficient. In *Connolly,* the Supreme Court upheld a government requirement that employers make cash contributions to pension plans as part of a governmental program to secure payment to employees of their privately funded pensions. 475 U.S. at 224, 106 S.Ct. at 1025. *Connolly* does not offer support for the notion than an assessment is for the government's "own use" simply because the government *could* have chosen to pay for the entire program itself. On the contrary, *Connolly* noted that the assessment of the employers arose "from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation." 475 U.S. at 225, 106 S.Ct. at 1026. It is extraordinary that plaintiffs assert that the assessment was for the protection and benefit of the government, for the government had no obligation to assist the System in the first

---

**16.** Assistance was provided to the Jackson Land Bank, the Louisville Land Bank (approximately $90 million), the Omaha Farm Credit Bank (ap-

proximately $110 million), and the St. Paul Farm Credit Bank (approximately $113 million). *See* Federal Defendant's Exhibits 35–37.

place and certainly had no obligation to include any federal guarantee in a legislative response to the financial crises facing the Farm Credit System.

For the foregoing reasons, the Court determines that the mandatory one-time stock purchase was not a taking under the fifth amendment. Defendants' motions for summary judgment on plaintiffs' taking claim are granted.

## III. CONCLUSION

For the reasons stated above, it is accordingly hereby

ORDERED that defendants' motions for summary judgment are granted.

IT IS SO ORDERED.

## JUDGMENT

In accordance with the Memorandum Opinion issued this date, judgment is hereby entered in favor of defendants Farm Credit Administration and Farm Credit System Financial Assistance Corporation and against Colorado Springs Production Credit Association, Monte Vista Production Credit Association, Sterling Production Credit Association, Garden City Production Credit Association, Flint Hills Production Credit Association, Northwest Kansas Production Credit Association, Albuquerque Production Credit Association, Duncan Production Credit Association, Clinton Production Credit Association, Woodward Production Credit Association, Southern New Mexico Production Credit Association, South Central Kansas Production Credit Association, and Enid Production Credit Association, plaintiffs in Civil Action No. 88–0574; Sikeston Production Credit Association, Delta Production Credit Association, and Southern Illinois Production Credit Association, plaintiffs in Civil Action No. 88–0583; and Chattanooga Production Credit Association, Central Kentucky Production Credit Association, Jackson Purchase Production Credit Association, Marion Production Credit Association, and Production Credit Association of Northern Ohio, plaintiffs in Civil Action No. 88–0584.

IT IS SO ORDERED.