967 F.2d 648
 296 U.S.App.D.C. 281
 COLORADO SPRINGS PRODUCTION CREDIT ASSOCIATION, et al., Appellants
v.
FARM CREDIT ADMINISTRATION, et al.
PRODUCTION CREDIT ASSOCIATION OF SOUTHEAST MISSOURI, Appellants
v.
FARM CREDIT ADMINISTRATION, et al.
CHATTANOOGA PRODUCTION CREDIT ASSOCIATION, et al., Appellants
v.
FARM CREDIT ADMINISTRATION, et al.
 Nos. 91-5077 to 91-5079.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 31, 1992.
Decided June 26, 1992.
 
 Carlos C. Smith, with whom William C. Carriger, Edward D. Meyer, Chattanooga, Tenn., Jeffrey H. Howard, Washington, D.C., and Joseph C. Blanton, Jr., Sikeston, Mo., were on the joint brief, for appellants in 91-5077, 91-5078, and 91-5079.
 [296 U.S.App.D.C. 283] Mark B. Stern, Attorney, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Robert S. Greenspan, Washington, D.C., Attorney, were on the brief, for appellee, Farm Credit Admin. in 91-5077, 91-5078, and 91-5079.
 Warren N. Davis, Mac Asbill, Jr., and Steuart H. Thomsen, Washington, D.C., were on the brief for appellee Farm Credit System Financial Assistance Corp. in 91-5077, 91-5078, and 91-5079.
 Before: EDWARDS, SILBERMAN, and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 The Farm Credit System (System) is a national network of federally chartered financial institutions whose purpose is to provide credit to the country's agricultural sector. Appellants are 20 financial institutions, known as production credit associations (PCAs), that are members of the System. PCAs are small, specialized banks, privately owned in cooperative form by their borrowers, that make short- and intermediate-term production loans directly to agricultural producers. See 12 U.S.C. § 2075.
 
 
 2
 The PCAs appeal from a district court judgment rejecting their challenge to the constitutionality of subsection 6.29 of section 201 of the Agricultural Credit Act of 1987, Pub.L. No. 100-233, 101 Stat. 1568 (1988) (codified at 12 U.S.C. § 2278b-9). That provision, which was designed to deal with a financial crisis in the Farm Credit System, forced the PCAs to transfer substantial amounts of their capital to a new corporation created by Congress, the Farm Credit System Financial Assistance Corporation (FAC). See 12 U.S.C. §§ 2278b, 2278b-1, 2278b-6(a). The 20 PCAs argue that the law requiring them to contribute to the solution of a crisis for which they were not responsible worked a taking of their property without just compensation and violated substantive due process. We think the law is consistent with the requirements of the Fifth Amendment and affirm the district court's grant of summary judgment to the Farm Credit Administration.
 
 I.
 
 3
 The statutory provision at issue was enacted as part of a comprehensive bailout of the Farm Credit System. The System, which was originally established in 1916 and which took its modern shape during the New Deal, provides "a reliable and competitive source of capital" to agricultural enterprises and rural borrowers who have historically had difficulty securing access to private capital. H.R. REP. No. 100-295(I), 100th Cong., 1st Sess. 55, reprinted in 1987 U.S. CODE CONG. & ADMIN.NEWS 2723, 2726. Despite significant expansion in the nation's mainstream financial services sector since the System was established, Congress has continued to regard the credit provided by the System as "essential to modern agriculture." H.R.REP. No. 99-425, 99th Cong., 1st Sess. 7, reprinted in 1985 U.S.CODE CONG. & ADMIN.NEWS 2587, 2593.
 
 
 4
 During the period relevant to our case, the System was organized in three basic horizontal tiers. The Farm Credit Administration, which had overall regulatory and supervisory authority over the financial institutions, was at the top of the structure. See 12 U.S.C. §§ 2243, 2252. Beneath the Administration were the farm credit banks themselves, organized into twelve districts along geographical lines, and divided within each district between a Federal Land Bank, a Federal Intermediate Credit Bank, and a Bank for Cooperatives. See H.R.REP. No. 100-295(I) at 55, 1987 U.S.C.C.A.N. at 2726. At the bottom of the pyramid, the local land banks, PCAs, and cooperative banks delivered credit directly to the individual agricultural borrowers. See id.
 
 
 5
 A regulatory framework binds the various System institutions together, but the primary economic link between them--and the key to the System's effectiveness--is the System's funding mechanism. All System institutions, including the PCAs, are privately owned but obtain their funds principally from a single, central source: [296 U.S.App.D.C. 284] the public sale of Farm Credit System securities. See 12 U.S.C. §§ 2153, 2160. The Federal Farm Credit Banks Funding Corporation sells debt obligations in the name of the System in the public markets and downstreams the proceeds to the intermediate farm credit banks. The intermediate banks then lend the funds to the local associations, who, in turn, make loans to the ultimate borrowers.
 
 
 6
 This is an especially low-cost source of funds for System institutions, for, while Farm Credit securities are not backed by the full faith and credit of the United States, see id. § 2155(c), the Farm Credit System is regarded in the public markets as a " 'Government sponsored entity.' " H.R.REP. No. 100-295(I) at 55, 1987 U.S.C.C.A.N. at 2726. The securities of such an entity are thought to carry an implicit government guarantee and are therefore afforded a "preferred place in the Nation's money markets," trading at spreads more favorable than those of even top-rated corporate borrowers. Id. The financial strength of the entire System, moreover, stands behind the bonds: all intermediate farm credit banks are jointly and severally liable for the System-wide debt obligations, see 12 U.S.C. § 2155, and all bottom-tier institutions are required to own stock in the intermediate banks. See id. § 2154a(c)(1)(E)(i). The low cost of funds to System institutions is presumably what enables them to serve agricultural borrowers profitably.
 
 
 7
 In the mid-1980s, the System experienced severe financial difficulty. A prolonged recession in the agricultural economy had resulted in declining land values and farm income, and debt burdens on individual agricultural borrowers had become onerous. Farmers were unable to pay off their loans, default rates increased, and the System suffered "massive losses." H.R.REP. No. 100-295(I) at 56-57, 1987 U.S.C.C.A.N. at 2728-29. As the losses mounted, investor confidence in Farm Credit securities declined. The System's cost of funds accordingly increased, reducing profitability still further. System institutions, including the PCAs, asked Congress to bail out the System, and experts on farm credit told Congress that "outside financial assistance would be necessary at some point to keep the System viable." Id. at 58, 1987 U.S.C.C.A.N. at 2729.
 
 
 8
 Congress, vindicating the market's perception that the United States implicitly stood behind the Farm Credit System, acted to prevent its collapse. A comprehensive rescue program was passed in 1987 that ultimately proved successful in reversing the System's fortunes. See Agricultural Credit Act of 1987, Pub.L. No. 100-233, 101 Stat. 1568 (1988). One feature of that program was the creation of FAC, which was authorized to issue up to $4 billion of bonds that would carry an explicit government guarantee. See 12 U.S.C. §§ 2278b, 2278b-6. The bond proceeds were to be used to provide direct financial assistance to System institutions whose capital had become impaired. See id. §§ 2278a-5, 2278b-7.
 
 
 9
 Although the Treasury bore responsibility for making portions of the interest payments on these obligations in the early years in which they were outstanding, the institutions of the Farm Credit System were required to reimburse the Treasury for any funds it expended. The Treasury's ultimate legal liability under the scheme, therefore, was that of a guarantor. See id. §§ 2278b-6(c), 2278b-8(c). During the course of negotiations over the shape of the Act, the Office of Management and Budget informed Congress that the government's liability as a guarantor could be treated off-budget if the Act required System institutions to contribute an amount equal to approximately 5% of the authorized debt to the cost of the guarantee. If funds provided by the System were obliged to absorb initial defaults, even if those funds accounted for only a percentage of the total value of the guarantee, budget figures would not have to reflect the potential cost of the bailout. Key legislators believed that passage of the Act required such off-budget treatment.
 
 
 10
 Accordingly, the Act in its final form included the provision which gave rise to this litigation: a requirement that healthy institutions in the System make a one-time [296 U.S.App.D.C. 285] purchase of FAC "stock," which, because it had no market value and paid no dividends, was in reality a forced contribution to the bailout scheme. See 12 U.S.C. § 2278b-9. The PCAs and land bank associations were compelled to surrender to FAC the entire amount of their unallocated retained earnings in excess of 13% of assets, see id. § 2278b-9(a)(1)(B), to be used to capitalize a trust fund designed to cover any defaults by System institutions with respect to the interest or principal payments due on the government-guaranteed bonds.[1] See id. §§ 2278b-5(b), 2278b-6(d)(3).
 
 
 11
 Because most of the System's financial difficulties were concentrated in the land banks and most of its capital was located in the PCAs, the burden of this assessment fell disproportionately on the PCAs--at least the healthy ones. The total capital placed in the trust fund was approximately $177 million, of which approximately $48 million came from the 20 PCAs who brought this lawsuit.[2] For appellants, that contribution was substantial. Although they maintained adequate capital and loan volume in the years following the assessment, they had to borrow funds to purchase the FAC stock, and the cost of servicing those loans caused a number of the formerly profitable PCAs to lose money.
 
 
 12
 Appellants filed suit in the district court for the District of Columbia, in which Congress had vested exclusive jurisdiction over challenges to the forced stock purchase. See id. § 2278b-9(e). The PCAs claimed, inter alia, that the assessment violated the Fifth Amendment's prohibitions on uncompensated takings of private property and deprivations of property without due process of law.
 
 
 13
 The district court, considering the due process claims, noted the extremely deferential standard that governs judicial review of economic legislation and upheld the statute as rationally related to a legitimate governmental purpose. See Colorado Springs Production Credit Ass'n v. Farm Credit Admin., 758 F.Supp. 6, 9-12 (D.D.C.1991). The court then analyzed the takings claim under the three-part test for regulatory takings set forth in Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). The first prong of Connolly considers the extent of a law's economic impact on the takings claimants. The district court concluded that "plaintiffs cannot show economic harm sufficient to support a determination that a taking has occurred." Colorado Springs, 758 F.Supp. at 14. It relied on the continuing adequacy of the PCAs' capital, the viability of their business prospects, and the "numerous benefits" the PCAs received from the 1987 Act. Id. at 13-14. Under the second of the Connolly factors, interference with reasonable investment-backed expectations, the district court acknowledged the private ownership of the PCAs but emphasized the "extensive supervision and control of the PCAs and the interdependent structure of [the] System" in holding that the PCAs should have been on notice that they might be called upon to support the System. Id. at 15. Finally, the district court held with respect to the third Connolly factor that the governmental action was not in the nature of an appropriation of PCA assets for the government's own use; rather, the seized funds were used for the benefit of the private System institutions themselves. See id. at 16. The district court therefore determined that the challenged provision of the 1987 Act was not a taking.
 
 
 14
 The PCAs appealed the district court's rulings on the takings and due process [296 U.S.App.D.C. 286] claims to this court. We agree with the district court's conclusion regarding the due process challenge for the reasons set forth in its opinion, and we therefore affirm the district court's decision on that claim without further discussion. Our discussion is limited to the question whether the forced stock purchase constituted a taking of private property without just compensation.
 
 II.
 
 15
 Appellants argue that the district court erroneously analyzed this case under Connolly as a regulatory taking; the court should instead have treated it as a "per se taking," which would be invalid without respect to the Connolly factors. And, even if the case were properly analyzed under Connolly, it is argued that the district court misapplied the factors and reached the wrong result, or, at a minimum, improperly resolved the case at the summary judgment stage. Essentially, appellants would have us see the case as one in which the government took property from Peter (the appellants) to give to Paul (the sick financial institutions), or, alternatively, in which the government took property from appellants for its own independent use. We do not think either is a correct characterization of what occurred.
 
 
 16
 The government seized appellants' funds, to be sure, but only as part of an overall legislative "transaction" in which appellants received enormous benefits. Prior to the passage of the 1987 Act, the entire interdependent Farm Credit System was in danger of collapse. The PCAs' own trial witness, Jim Billington, told Congress that without financial assistance, the Farm Credit System would perish due to "the cost or unavailability of funds." Agricultural Credit Conditions, Problems, and Legislative Proposals Relating to the Farmers Home Admin., the Farm Credit Sys., and Comm'l Farm Lenders: Hearings Before the Subcomm. on Conservation, Credit, and Rural Development of the House Comm. on Agric., 100th Cong., 1st Sess., pt. 2, at 1562 (1987) (hereinafter Hearings ). According to another witness, without governmental intervention, some institutions would have defaulted on System bonds, sending the System's cost of funds soaring and triggering joint and several liability among the intermediate banks. And by the time the 1987 Act became law, many of the PCAs' intermediate banks had accrued substantial accounts payable under private loss-sharing Capital Preservation Agreements with other System banks. See 12 U.S.C. §§ 2013(23), 2073(15).
 
 
 17
 The 1987 Act, along with an improving agricultural economy, rescued the System, and in doing so, also rescued the PCAs. The PCAs would not exist and probably could not survive apart from the System.[3] Appellants do not argue that they could have survived a collapse of the System. They do not even suggest that, profitable as they were, they could have become stand-alone financial institutions competing for funds in the open money market. When Jim Billington warned Congress in 1987 about the System's imminent collapse, he explicitly noted that the PCAs' demise would inevitably follow. See Hearings at 1562. The PCAs are hostages to the financial health of the System not just because of their critical dependence on the System's low-cost funding, but also by virtue of the requirement that they own stock in their intermediate farm credit banks. See 12 U.S.C. § 2154a. Because the intermediate banks are jointly and severally liable for the System-wide debt obligations, see 12 U.S.C. § 2155, insolvency anywhere in the System would not only diminish the value of this investment--typically a PCA's largest single asset--it could also trigger further demands on the PCAs' capital.[4] It may well be that other financial institutions, [296 U.S.App.D.C. 287] either banks or PCAs, were the ones whose troubles directly endangered the System, but since all the institutions were lashed together with regulatory and financial line, if the weaker institutions sunk, so would appellants.
 
 
 18
 The bedrock principle of the Takings Clause, whatever doctrinal form cases interpreting it may take, has been consistently reiterated by the Supreme Court. It is that the Takings Clause is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960); accord Pennell v. City of San Jose, 485 U.S. 1, 9, 108 S.Ct. 849, 856, 99 L.Ed.2d 1 (1988); First English Lutheran Evangelical Church v. County of Los Angeles, 482 U.S. 304, 318-19, 107 S.Ct. 2378, 2387-88, 96 L.Ed.2d 250 (1987); Connolly, 475 U.S. at 227, 106 S.Ct. at 1027; Webb's Fabulous Pharmacies v. Beckwith, 449 U.S. 155, 163, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980); Penn Central Transp. Co. v. New York City, 438 U.S. 104, 123, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978).
 
 
 19
 One circumstance in which a burden cannot be said to belong totally to the public is when its correlative benefit does not flow to the public as a whole. Some laws provide a disproportionate benefit to certain persons, and efforts to require them to pay for those benefits do not offend the Constitution, even though the law itself might be in the general public interest. The notion of reciprocal benefit, or, in Justice Holmes' words, "average reciprocity of advantage," Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), pervades the cases rejecting takings challenges.[5] See, e.g., Ruckleshaus v. Monsanto Co., 467 U.S. 986, 1007, 104 S.Ct. 2862, 2875, 81 L.Ed.2d 815 (1984); Penn Central, 438 U.S. at 134-35, 98 S.Ct. at 2664-65; Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 394, 47 S.Ct. 114, 120, 71 L.Ed. 303 (1926). It also underlies at least two of the three Connolly factors.
 
 
 20
 A long line of Supreme Court decisions emphasizes that the government may compel a private party to surrender its funds without providing compensation if the government's use of those funds confers a significant, concrete, and disproportionate benefit on that party. In one of the earliest of these cases, the Court held that a state law requiring banks to pay deposit insurance premiums does not work a taking, because "the share of each party in the benefit of a scheme of mutual protection is sufficient compensation for the correlative burden that it is compelled to assume." Noble State Bank v. Haskell, 219 U.S. 104, 110-11, 31 S.Ct. 186, 188, 55 L.Ed. 112 (1911); see also Leonard & Leonard v. Earle, 279 U.S. 392, 396, 49 S.Ct. 372, 373, 73 L.Ed. 754 (1929) (rejecting oyster packers' objection to state's seizure of 10% of oyster shells when the shells are used to reseed oyster beds and are therefore "used as greatly to advantage the business of packing"); Norwood v. Baker, 172 U.S. 269, 278-79, 19 S.Ct. 187, 190, 43 L.Ed. 443 (1898) (upholding special assessment of abutting property owners for road construction because of the "special or peculiar benefits accruing" to them). As long as the amount taken is "a fair approximation of the cost of the benefits supplied,' " additional compensation is not required. United States v. Sperry Corp., 493 U.S. 52, 60, 110 S.Ct. 387, 394, 107 L.Ed.2d 290 (1989) (quoting Massachusetts v. United States, 435 U.S. 444, 463 n. 19, 98 S.Ct. 1153, 1165 n. 19, 55 L.Ed.2d 403 (1978)).
 
 
 21
 [296 U.S.App.D.C. 288] We are satisfied that in this case the PCAs derived benefit from the Act roughly commensurate with the burdens they were forced to bear. It was, in fact, the American taxpayer who, by standing behind and financing the government guarantees, contributed the most to saving the System. Appellants' contribution was merely an offset to the amount the taxpayer contributed, without which appellants would have lost all. Appellants' share of the total cost of the forced purchase of FAC stock should not exceed $100 million, and will likely be much less.[6] In return for their $100 million, the PCAs received the systemic benefits of the $4 billion of government-guaranteed debt financing the 1987 Act made available, benefits the PCAs acknowledge were substantial. They received a large and immediate reduction in their cost of funds. According to a conservative estimate, they saved approximately 40 to 60 basis points per year in interest costs, which, across the entire System, amounts to a savings of $216 million to $324 million per year. (The record does not disclose the appellants' share of this total savings.) The actual figures could conceivably be more than 150 basis points, or upwards of $800 million per year. And the 1987 Act saved for the appellants the value of their investments in the intermediate farm credit banks. As of December 31, 1987, this amounted to $102 million, or 17% of appellants' assets and 75% of their unallocated surplus.[7]
 
 
 22
 Less tangible but similarly beneficial to the PCAs were the restructuring provisions of the Act. The forced stock purchase indirectly made available to the PCAs direct financial assistance from FAC in the event they required such assistance. See 12 U.S.C. §§ 2278a-5, 2278b-7. The Act also gave System institutions expanded power to merge with each other, a power that many employed to their advantage. See Agricultural Credit Act of 1987, Pub.L. No. 100-233, § 416, 101 Stat. 1647 (1988) (codified as amended at 12 U.S.C. §§ 2279a-2279f-1). Finally, the Act provided for an insurance fund, capitalized in part by the remainder of the funds seized from the PCAs, whose credit enhancement for System securities will ultimately inure to the benefit of the PCAs in the form of lower interest costs. See 12 U.S.C. § 2277a-9.
 
 
 23
 These benefits were not vague, abstract, or indirect, running to the PCAs through their mere status as citizens. Rather, the benefits were substantial, concrete, and direct.[8] The comparison between benefit and [296 U.S.App.D.C. 289] burden need not be made with mathematical precision. Demonstrating dollar-for-dollar equivalency would, in most cases, be impracticable, especially where benefits will accrue over a long period of time.[9] Although the PCAs were compelled by the 1987 Act to assume special burdens, the Act itself conferred on them roughly equivalent special benefits. Cf. Norwood, 172 U.S. at 278, 19 S.Ct. at 190.
 
 
 24
 The PCAs argue strenuously that the benefits they enjoyed were not special. They contend that they received no advantages from the Act not enjoyed equally by all other financial institutions in the Farm Credit System. Indeed, the sick institutions received more direct assistance than did the assessed PCAs, and the general benefits of lower interest costs accrue in proportion to an institution's loan volume rather than its unallocated retained earnings, the measure on which the assessment was based. In the eyes of the PCAs, the Act placed a disproportionate share of the cost of the bailout on their shoulders relative to other Farm Credit institutions, and this renders the statute fatally defective.
 
 
 25
 Appellants' argument has an artificial quality, because it was obviously not feasible for the sick financial institutions to put up hard cash to contribute to the rescue of the System. Implicitly, therefore, appellants argue that the government, the American taxpayer, should have contributed more. In any event, the PCAs fundamentally misconceive the reciprocal benefit test. The question is not whether there were other subgroups who could or should have borne a greater share of the burden as a policy matter; the judiciary is not institutionally fitted to undertake such an inquiry. The Takings Clause does not require that the party whose financial assets are taken or transferred be the exclusive beneficiary of the government's use of those assets. See Penn Central, 438 U.S. at 133, 98 S.Ct. at 2663. If it did, all of the cases in which the Supreme Court has upheld special assessments on property owners for street construction would be wrongly decided. See, e.g., French v. Barber Asphalt Paving Co., 181 U.S. 324, 21 S.Ct. 625, 45 L.Ed. 879 (1901); Norwood, 172 U.S. 269, 19 S.Ct. 187, 43 L.Ed. 443 (1898). Nor does the Takings Clause require that Congress accomplish its ends in the very best or fairest manner. See Sperry, 493 U.S. at 60-61, 110 S.Ct. at 393-94. If the government provides the burdened party with benefits that are a "fair approximation," Massachusetts v. United States, 435 U.S. 444, 463 n. 19, 98 S.Ct. 1153, 1165 n. 19, 55 L.Ed.2d 403 (1978), of the value it has relinquished, that is enough.
 
 
 26
 The appellants seek to avoid confinement in this analytical framework--to escape our focus on the amount of benefit they received--by arguing that the forced stock purchase falls into the category of a "per se " taking. Compensation is required for such a taking without a detailed inquiry into the government's purposes, the extent of the harm suffered by the property owner, or the social benefits that accompany the seizure. See, e.g., Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 434-35, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868 (1982); United States v. Causby, 328 U.S. 256, 261-62, 66 S.Ct. 1062, 1065-66, 90 L.Ed. 1206 (1946). Although per se takings typically involve a "permanent physical occupation" of real property, Loretto, 458 U.S. at 426, 102 S.Ct. at 3171, as appellants point out, the category has not been so limited: they argue it encompasses any seizure of property that 1) permanently and totally deprives the owner of its use, and 2) involves "required acquiescence," FCC v. Florida Power Corp., 480 U.S. 245, 252, 107 S.Ct. 1107, 1112, 94 L.Ed.2d 282 (1987), which is to say that the owner is forced to surrender the property [296 U.S.App.D.C. 290] under threat of legal sanction.[10] The PCAs rely on the Supreme Court's decision in Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), as support for their contention that the permanent and total appropriation of their money by FAC under threat of substantial fines, see 12 U.S.C. § 2268(a), amounted to an unlawful per se taking.
 
 
 27
 Webb's Fabulous Pharmacies invalidated a Florida statute that took for Florida's courts the interest accruing on court-deposited interpleader funds. Appellants are correct that the Court did not undertake an analysis of the purposes and effects of the law in striking it down. See Webb's Fabulous Pharmacies, 449 U.S. at 163, 101 S.Ct. at 451. It is also true that the case involved a seizure of money, rather than real property. Appellants are wrong, however, in explaining why the Court invalidated the law as a per se taking and in defining the characteristics of such a taking. They ignore that the Court's decision in Webb's Fabulous Pharmacies was premised on the absence of the very condition that makes the seizure of the PCAs' funds lawful in this case. The disposition there turned on the Court's conclusion that the exaction was "not reasonably related to the costs of using the courts." Id. The parties to litigation in the Florida courts already paid a fee to cover the services rendered in connection with the custody of the interpleader deposits, so Florida had no legitimate justification for taking the interest. That is, the seizure of the parties' funds was not invalidated because it had certain abstract characteristics that placed it in a category of per se takings; rather, the law was struck down because it was so clearly devoid of justification under the substantive principles of takings law we have discussed. The core of the Takings Clause remains the same no matter what form the challenged governmental action takes: per se is merely a "shorthand means" of identifying a "distinct subset of governmental excesses that would invariably merit compensation were a fuller analysis undertaken." Kmiec, The Original Understanding of the Taking Clause is Neither Weak Nor Obtuse, 88 COLUM.L.REV. 1630, 1665 (1988) (emphasis in original). That all permanent and total deprivations of money do not fall into that subset is clear; the Supreme Court has several times analyzed such deprivations as other than per se takings. See, e.g., Sperry, 493 U.S. at 62, 110 S.Ct. at 394; Hodel v. Irving, 481 U.S. 704, 714-17, 107 S.Ct. 2076, 2082-83, 95 L.Ed.2d 668 (1987); Connolly, 475 U.S. at 222-23, 225-27, 106 S.Ct. at 1024-25, 1026-27. Indeed, the Court's recent decision in Yee v. City of Escondido, --- U.S. ----, 112 S.Ct. 1522, 118 L.Ed.2d 153 (U.S.1992), may well limit, if only implicitly, the category of per se takings to "unwanted physical occupation[s] of ... property." Id. at ----, 112 S.Ct. at 1531.
 
 
 28
 "Takings" of the type complained of in this case seem to us to be essentially compelled contracts, and the courts need only police them for unconscionability. If the burdened party might well have contracted voluntarily for the arrangement ultimately imposed upon it by the government, there is no taking. We think that faced with the choice between governmental inaction coupled with continuing deterioration in the System as a whole, which, as we have seen, would likely have resulted in the System's and the PCAs' demise, or the surrender of their excess capital and a comprehensive bailout, the PCAs would have rationally--if not certainly--surrendered their capital. This is so notwithstanding that a number of formerly profitable PCAs have been forced to endure several years of losses. Long-term survival through short-term losses is surely preferable to medium-term extinction. That the PCAs would rather have received federal assistance and kept their excess capital is immaterial; whatever amount they were compelled to pay for the help they received, a much larger portion of the assistance was [296 U.S.App.D.C. 291] paid for, directly or indirectly, by the American taxpayer. The statute is therefore constitutional, and we affirm the judgment of the district court.
 
 
 29
 It is so ordered.
 
 
 
 [1]
 Any amounts remaining in the trust fund after the government-guaranteed bonds are retired are to be transferred to a new insurance fund established by the 1987 Act that will insure the timely payment of interest and principal on the System's normal debt offerings. See 12 U.S.C. § 2277a-9
 
 
 [2]
 As much as 68% of this could ultimately be returned to the assessed institutions, however, pursuant to amendments Congress enacted in 1988 and 1989 (the Bumpers-Pryor Amendments) under which FAC will pay periodic interest on the portion of the assessment that corresponds to FAC's unused borrowing authority and will refund the unused money when the borrowing authority expires in October 1992. See Pub.L. No. 100-460, § 646, 102 Stat. 2229, 2266 (1988); Pub.L. No. 101-220, § 7(a), (b), 103 Stat. 1876, 1881 (1989)
 
 
 [3]
 They cannot even withdraw from the System without prior approval. See Amarillo Production Credit Ass'n v. Farm Credit Admin., 887 F.2d 507 (5th Cir.1989)
 
 
 [4]
 Prior to the 1987 Act, the intermediate banks had statutory authority to require additional purchases of their stock by the PCAs when the banks' capital needs required it. See 12 U.S.C. § 2073(g) (1982), repealed by, Agricultural Credit Act of 1987, Pub.L. No. 100-233, § 401, 101 Stat. 1568 (1988)
 
 
 [5]
 We note that there are different ways to think about the doctrinal relevance of reciprocal benefit. We rely on the notion that appears in the case law, which is that reciprocal benefit renders a governmental seizure of assets not a taking. See, e.g., United States v. Sperry Corp., 493 U.S. 52, 62, 110 S.Ct. 387, 394, 107 L.Ed.2d 290 (1989). It might be more accurate, however, to say that a reciprocal benefit amounts to "implicit in-kind compensation" for governmental action that is a taking. See R. EPSTEIN, TAKINGS 195 (1985). Nothing of substance hinges on this characterization, because the seemingly distinct questions whether something is a taking and whether compensation must be required are, in reality, a single inquiry. See Paul, The Hidden Structure of Takings Law, 64 SO.CAL.L.REV. 1393, 1433 (1991)
 
 
 [6]
 This amount consists of both the principal amount of the assessment and the interest costs associated with the funds borrowed in order to pay it. Although it is impossible to identify a total dollar cost with certainty due to the prospect of a substantial refund at the end of this year under the Bumpers-Pryor amendments, see supra note 2, the maximum possible principal amount is $177 million, of which the appellants would be responsible for approximately $48 million. In all likelihood, the aggregate principal amount will be much closer to $50 or $60 million, of which only $13.5 to $16.2 million would be appellants' share. The record does not disclose the present value of the expected interest costs, but they are unlikely to exceed the principal amounts
 
 
 [7]
 In addition to preventing bond defaults and joint and several liability through direct assistance to troubled institutions, FAC assumed from the intermediate banks $415 million in accrued liabilities on Capital Preservation Agreements, at least $75 million of which was owed by appellants' intermediate banks
 
 
 [8]
 The government makes a related argument, which was also accepted by the district court, based on the PCAs' status as "extensively regulated" entities. The forced stock purchase, it is claimed, does not amount to a taking, because the PCAs should reasonably have expected, given the level of governmental involvement in their affairs, that "new obligations might be imposed by Congress." Although the Supreme Court has suggested that doing business in a regulated field might reduce an enterprise's reasonable expectation of noninterference, see Connolly, 475 U.S. at 225-27, 106 S.Ct. at 1026-27, we are unsure how much weight to put upon governmental supervision and regulation in takings analysis. In this era of pervasive regulation, this factor might prove far too much: almost any entity could be said to have a reasonable expectation of governmental intrusion. If the existence of regulation were critical to takings claims, the long-established principle that a public utility has had its property taken if its rates are set too low would appear rather dubious. See, e.g., Duquesne Light Co. v. Barasch, 488 U.S. 299, 307-08, 109 S.Ct. 609, 615, 102 L.Ed.2d 646 (1989)
 
 
 [9]
 Thus, contrary to the PCAs' urgings, this case was properly resolved on the record before the district court at the summary judgment stage of proceedings. The dispute did not concern material facts; it was only over the legal significance of those facts. A remand for the purposes of adducing more expert economic testimony and refining calculations would be of no value, because the existing record reveals the rough equivalency of benefit and burden that the law requires
 
 
 [10]
 The PCAs concede that the constitutionally recognized forms of taxation fall outside the scope of this analysis