STUDENT LOAN MARKETING ASSOCI-
ATION, Appellant/Cross–Appellee,

v.

Richard W. RILEY, Secretary of the
United States Department of Edu-
cation, Appellee/Cross–Appellant.

Nos. 95–5428, 96–5016.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 18, 1996.

Decided Jan. 10, 1997.

Order on Rehearing March 11, 1997.

Alan Kriegel, Washington, DC, argued the cause for appellant/cross-appellee. Richard L. Brusca, Amy R. Sabrin, Robert S. Bennett, Timothy G. Greene and Robert S. Lavet were with him on the briefs.

Douglas N. Letter, Litigation Counsel, United States Department of Justice, Washington, DC, argued the cause for appellee/cross-appellant. Frank W. Hunger, Assistant Attorney General, and Eric H. Holder, Jr., United States Attorney, were with him on the briefs. Barbara C. Biddle, Assistant Director, entered an appearance.

Before: WALD, WILLIAMS and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

Concurring Opinion filed by Circuit Judge WALD.

STEPHEN F. WILLIAMS, Circuit Judge:

In the Omnibus Budget Reconciliation Act of 1993, Congress added § 439(h)(7) to the Higher Education Act of 1965, imposing a 0.3 percent "offset fee" on the principal amount of each student loan that the Student Loan Marketing Association ("Sallie Mae") "holds." The Department of Education interpreted the statute as applying to any loan in which Sallie Mae has a financial interest, and, in particular, to loans that Sallie Mae has "securitized." (A firm "securitizes" assets by conveying them to a separate entity, typically a "bankruptcy-remote vehicle," which pays the securitizing firm with the proceeds of newly issued securities backed by the transferred assets. See Lynn M. LoPucki, "The Death of Liability," 106 Yale L.J. 1, 23 (1996).) Sallie Mae sued in district court, alleging that the statutory fee was a taking without just compensation and that the Department's claim that the fee applied to securitized loans ran counter to the unambiguous meaning of the statute.

The district court rejected Sallie Mae's taking claim, but it invalidated the Department's attempted application of the fee to securitized loans. Because the Higher Education Act affords Sallie Mae benefits roughly approximating the burden of the offset fee,

which in any event applies only to loans *acquired* by Sallie Mae after the effective date of the amendment, we affirm the decision that there was no taking. As to the application of § 439(h)(7) to securitized loans, we agree with the district court that the Department's interpretation of the statute was impermissible. Because the Department has not yet applied a correct interpretation to loans subject to the sort of arrangements that Sallie Mae has adopted and proposes for the future, we reverse and remand to the district court, for it to remand the case to the Department.

\* \* \* \* \* \*

Under the Guaranteed Student Loan Program the federal government serves as guarantor of unsecured student loans and subsidizes interest payments on those loans. A single loan may, in the course of its lifetime, make its way through three different institutions—a bank, a secondary institution (such as Sallie Mae), and a guaranty agency—before the federal government finally intervenes and makes good on its guarantee.

Sallie Mae was established in 1972 to provide lender banks with greater liquidity. See 20 U.S.C. § 1087–2(a). It is a source of financing. for participating banks (it makes loans secured by guaranteed student loans) and a major purchaser of student loans in the secondary market. Operating under a federal charter, it is a for-profit, privately owned corporation, but it also enjoys certain benefits such as an exemption from state and local taxes other than real estate taxes. See *id.* § 1087–2(b)(2).

Guaranty agencies, usually state-run, nonprofit organizations, act as intermediaries for the federal government. They enter into guaranty agreements with banks and secondary institutions, and, in the event of default, take over the loan and reimburse the financial institution. See *id.* § 1075(b). If the guaranty agency is unsuccessful in collecting the loan, it may file a claim with the Department of Education for reimbursement. See *id.* § 1078(c). Federal interest payments and the federal guarantee are contingent on compliance with elaborate procedures that control every aspect of the loan, from the initial explanation to the borrower to the

dunning methods employed if the loan falls delinquent. See, e.g., *id.* § 1080(a), (d); Sallie Mae Funding Corporation, Registration Statement dated August 7, 1995 ("Registration Statement") 14 (listing "Risk Factors").

The 1993 amendment, § 439(h)(7) of the Higher Education Act, reads as follows:

(A) The Association [Sallie Mae] shall pay to the Secretary, on a monthly basis, an offset fee calculated on an annual basis in an amount equal to 0.30 percent of the principal amount of each loan made, insured or guaranteed under this part that the Association *holds* ... and that was acquired on or after August 10, 1993....

(C) The Secretary shall deposit all fees collected pursuant to this paragraph into the insurance fund established in section 1081 of this title.

20 U.S.C. § 1087–2(h)(7) (emphasis added), enacted as part of the Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66, Title IV, Subtitle B. The fund referred to in subsection (C) is available for payment on defaulted loans. See 20 U.S.C. § 1081(a).

After enactment of the offset fee provision, the Department learned, through a Sallie Mae submission to the Office of Management and Budget, that Sallie Mae was planning to securitize a portion of its loan portfolio and that it believed that securitized loans would be exempt from the fee. Essentially, Sallie Mae proposed to create a trust that would purchase Sallie Mae loans, financing the purchase with the proceeds of securities that would be backed by the loans. The income generated by the loans in the trust would satisfy payments due on the securities. Sallie Mae would continue to be responsible for administration of the loans under a service contract with the trust and would retain certain residual financial interests in the trust assets.

On January 13, 1995 Steven Winnick, Acting General Counsel of the Department of Education, wrote a letter to Sallie Mae's general counsel (the "Winnick letter"), stating the Secretary of Education's position on the applicability of § 439(h)(7) to the securitized loans. It was, according to the letter, "appropriate to interpret the term 'holds' [in

§ 439(h)(7) ] to include any loan in which Sallie Mae holds a direct or indirect financial interest." The letter pointed to the "residual interest" that Sallie Mae would retain in the trust, as well as to its role as servicer of the loans, and argued that "[n]either the words of [the statute], nor the applicable legislative history, suggests that Congress intended to limit the Secretary in defining the term 'holds' in § 439(h)(7)." The letter made it clear that the Department was under the impression that Sallie Mae was attempting to evade the fee; it analogized the case to the "Clifford regulations," under which the Internal Revenue Service had attributed the income of certain trusts to the grantor in order to prevent income tax avoidance.

Sallie Mae responded with a letter and an attached legal opinion critiquing the Winnick analysis, and representatives of Sallie Mae also met with Felix Baxter, Deputy General Counsel of the Department, to press their argument. In a letter dated March 16, 1995 (the "Baxter letter"), Baxter answered some of the objections made by Sallie Mae and confirmed the view expressed in the Winnick letter. After another letter from Sallie Mae, its representatives met with the Secretary on April 12, 1995. He reiterated the Department's position, and Sallie Mae's representatives told him of their intention to bring suit. Since then, Sallie Mae has securitized about $4 billion in loans (out of a portfolio of at least $34 billion), in transactions roughly along the lines of the trust securitization described to the Secretary.

### Taking Claim

■ As a preliminary matter, we must address the issue of whether we have jurisdiction over Sallie Mae's taking claim. Sallie Mae requests a declaratory judgment that the offset fee imposed by Congress is an unconstitutional taking in violation of the Fifth Amendment. Normally a taking claim against the federal government must be brought as a suit for money damages (i.e., the "just compensation" that the Constitution assures) under the Tucker Act in the Court of Federal Claims, 28 U.S.C. § 1491, or, for amounts not exceeding $10,000, under the Little Tucker Act in district court. 28 U.S.C.

§ 1346(a)(2); see *Preseault v. ICC,* 494 U.S. 1, 11–12, 110 S.Ct. 914, 921–22, 108 L.Ed.2d 1 (1990); *Ruckelshaus v. Monsanto,* 467 U.S. 986, 1016–19, 104 S.Ct. 2862, 2879–81, 81 L.Ed.2d 815 (1984). So long as such jurisdiction is available, the plaintiff is barred from suing for equitable relief in district court, see *Ruckelshaus,* 467 U.S. at 1020, 104 S.Ct. at 2881–82, or is required to seek a Tucker Act remedy first, before suing for equitable relief, see *Preseault,* 494 U.S. at 11, 110 S.Ct. at 921–22. (The Tucker Act and Little Tucker Act themselves do not normally supply a waiver of sovereign immunity for equitable relief. See *Richardson v. Morris,* 409 U.S. 464, 465, 93 S.Ct. 629, 630–31, 34 L.Ed.2d 647 (1973).) The Court has stated broadly that a Tucker Act remedy is available *unless* "Congress has ... *withdrawn* the Tucker Act grant of jurisdiction ... to hear" the claim for compensation. *Preseault,* 494 U.S. at 12, 110 S.Ct. at 922 (emphasis in original, internal quotations and citations omitted).

■ Despite that broad language, the Supreme Court has itself ruled on the merits of federal taking claims, without making any inquiry as to whether Tucker Act jurisdiction had been withdrawn, and even though plaintiffs had made no attempt to pursue a Tucker Act remedy. See *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.,* 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). This could, of course, be oversight. But in *In re Chateaugay Corp.,* 53 F.3d 478, 493 (2d Cir.1995), the Second Circuit offered an explanation for such cases, pointing out that they involved mandates of "direct transfers of money to the government." *Id.* For such cases, use of the Tucker Act remedy would entail an utterly pointless set of activities, as "[e]very dollar paid pursuant to a statute would be presumed to generate a dollar of Tucker Act compensation." *Id.* It contrasted cases such as *Concrete Pipe* and *Connolly* with ones involving statutes that burdened "real or tangible property," *id.,* for which the Tucker Act remedy would be presumptively sensible. *Chateaugay*'s reading of the cases appears sound. To rephrase its analysis more directly in the language of *Preseault,*

then, in cases involving straightforward mandates of cash payment to the government, courts may reasonably infer either that Tucker Act jurisdiction has been withdrawn or at least that any continued availability does not wipe out equitable jurisdiction. Accordingly, we reach the merits.

■ The Fifth Amendment states that private property shall not "be taken for public use without just compensation." It does not follow, however, that the imposition of a special regulatory burden on a person or entity is necessarily a taking. If the regulatory action in question benefits the burdened persons, and the amount of the burden is "a fair approximation of the costs of benefits supplied," then no taking is said to have occurred. *United States v. Sperry Corp.*, 493 U.S. 52, 60, 110 S.Ct. 387, 394, 107 L.Ed.2d 290 (1989) (quoting *Massachusetts v. United States*, 435 U.S. 444, 463 n. 19, 98 S.Ct. 1153, 1165 n. 19, 55 L.Ed.2d 403 (1978)); see also *Colorado Springs Prod. Credit Ass'n v. Farm Credit Administration*, 967 F.2d 648 (D.C.Cir.1992); cf. Richard A. Epstein, Takings 195 (1985) (characterizing benefits conferred by legislation as "implicit in-kind compensation" for regulatory takings).

In *Colorado Springs* we considered legislation requiring the healthy banks in the Farm Credit System to make a contribution to a scheme for bailing out the entire system. Under the scheme Congress "vindicat[ed] the market's perception that the United States implicitly stood behind the Farm Credit System" by providing an explicit guarantee. 967 F.2d at 651. Despite the apparent health of the complaining banks, the rescue operation redounded to their benefit because they were so "lashed together" with the unhealthy ones that the failure of the latter would have dragged them down as well. 967 F.2d at 654–55. We found that the various features of the legislation gave the healthy banks "substantial, concrete, and direct" benefits. *Id.* at 655. As it would have been impracticable to show dollar-for-dollar equivalency, the evidence of "rough equivalency of benefit and burden" was enough to defeat the taking claim. *Id.* at 656 n. 9.

■ Section 439(h)(7) is different from the bailout legislation assessed in *Colorado*

*Springs* in a number of ways. First, the benefits of the Higher Education Act, which are enjoyed by student borrowers, institutions of higher education, and numerous private and state lending institutions, are more widely distributed than in *Colorado Springs*, where many of the farmers who had access to credit because of the banking system were also owners of the banks in the system. Nonetheless, because students cannot pledge their human capital in any way paralleling the use of physical capital as security, the student loan market would likely be a fraction of its current size without the federal guarantees. And, in fact, there has been a high rate of default on student loans. See *Permanent Subcomm. on Investigations, Abuses in Federal Student Aid Programs*, S.Rep. No. 102–58, at 1 (1991). As the largest player in this artificially generated market, Sallie Mae is a—perhaps the—prime beneficiary of the loan guarantee fund that the offset fee helps underwrite. This distinction from *Colorado Springs*, then, is one of degree.

Sallie Mae also notes that the fee was passed as part of the 1993 Budget Act for the purpose of generating government revenue, not to stave off a crisis in the system of which it is a part, as had been the case in *Colorado Springs*. Given the application of the offset fee revenue to the guarantee fund, however, this distinction appears almost immaterial. A third distinction is that Sallie Mae is already burdened by the requirement that it serve as lender-of-last-resort to students who meet the federal loan criteria but pose risks that are excessive in the eyes of all other financial institutions (even with the guarantee); the offset fee comes on top of that. We return to this issue later in addressing the prospective nature of the offset fee.

Apart from Sallie Mae's role as a beneficiary of the basic system of loan guarantees, the government points to a number of specific advantages it has received. We start by discarding three of them as of little or no relevance: (1) start-up financing from the government permitting Sallie Mae to borrow at a lower interest rate than would otherwise have been available, see 20 U.S.C. § 1087–

2(b)(3); (2) a market perception that the government would bail out Sallie Mae with federal funds in the event of widespread defaults; and (3) a statutory capital requirement of two percent of assets, significantly lower than the roughly eight percent requirement characteristically applicable to the commercial financial institutions with which Sallie Mae competes, 20 U.S.C.§ 1087–2(r)(4); Oxendine Decl. ¶ 5(c).

The initial seed capital is pure history. Sallie Mae borrowed no funds under this authorization after 1982 and has fully repaid the debt in accordance with the terms of the agreement. Nowhere in the agreement did the government reserve the right to impose a future fee on Sallie Mae, and government exactions eleven years after the last borrowing cannot possibly be viewed as compensation for previously granted benefits. Many persons and firms receive one-time tax breaks, as well as other forms of financial incentives, and to hold that this allows legislators forever after to impose financial burdens upon the earlier beneficiaries would largely gut the takings clause. Imagine the surprise, for instance, of the holders of land patented gratis by the federal government under the Homestead Acts if they were to wake up and discover that the government could subject them to a special tax because of the way title had been acquired, generations before.

Nor does the apparent market perception that the government will use public funds to prevent the failure of Sallie Mae, unsupported by anything in Sallie Mae's federal charter or offering circulars for debt securities, constitute a relevant benefit. While the perception presumably gives Sallie Mae a distinct advantage over private and state institutions in the secondary student loan market, the benefit was created inadvertently by the government through its past actions, and not by any enforceable guarantee made in Sallie Mae's charter or elsewhere.

The two percent capital requirement applicable to Sallie Mae does not set it apart in any meaningful way from the other banks in the student loan system. The regulations that establish capital standards for such banks adjust for the risk of the different types of assets held by banks. Since federally guaranteed student loans fall into a relatively low-risk category, the capital standard for Sallie Mae's competitors is, according to Sallie Mae's calculations, uncontested by the government, 20 percent of eight percent, i.e., 1.6 percent. Thus a competitor confining its activities to student loans would evidently be in a better position than Sallie Mae on this score.

The more persuasive specific benefits accruing to Sallie Mae by virtue of its place in the Federal Student Loan Program, which the fee in part finances, are these: (1) exemption of debt offerings from SEC registration requirements; (2) exemption from state and local taxes, 20 U.S.C. § 1087–2(b)(2); and (3) access to borrowing from the Federal Financing Bank, 20 U.S.C. § 1087–2(h)(6), which is said to be at low cost, although Sallie Mae has not borrowed from the bank apart from the initial seed money loan now fully repaid. District Court Opinion 4; Oxendine Decl. ¶ 5(d).

The most telling of these is probably the statutory exemption from state and local tax liability. Sallie Mae responds by saying that even without the specific exemption it would qualify for such relief as a federal instrumentality. See *Dep't of Employment v. United States*, 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966). The explicit statutory exemption at a minimum, however, saves Sallie Mae the burden of litigation to establish its status, and of course relieves it of any risk that it might be found not to qualify. Moreover, the exemption is a continuing benefit because Congress could at any time waive Sallie Mae's immunity from state and local taxes by enacting a clear statement to that effect. Cf. *Graves v. New York ex rel. O'Keefe*, 306 U.S. 466, 480, 59 S.Ct. 595, 598, 83 L.Ed. 927 (1939).

The other benefits also appear material. The exemption from SEC registration requirements saves Sallie Mae legal and accounting fees. Although Sallie Mae attributes the exemption to the restrictive nature of its federal charter, which largely limits its operations to the secondary market for student loans, at a minimum it crystallizes Sallie Mae's special relationship to the market for

student loans and the risk reduction afforded by the government guarantee. Finally, even though Sallie Mae's non-use of low-cost Treasury borrowing suggests its value is limited, the access to such borrowing (which is ill-defined on this record) may provide a marginal reduction in the risk of future insolvency.

Although Sallie Mae's various advantages are hard to quantify, viewed in the absolute the Higher Education Act appears to contain the "rough equivalency" that we found sufficient in *Colorado Springs*. Sallie Mae argues, however, that by singling it out of all of the "holders" of government-guaranteed student loans for the payment of the offset fee, Congress unjustly burdened it for benefits shared by all such holders. In *Colorado Springs*, however, we rejected a comparable argument advanced by the complaining banks, in which they claimed that their forced contribution could not stand because other, unhealthy banks that were greater beneficiaries of the bailout program, were not required to make the contribution. "The question is not," we said, "whether there were other subgroups who could or should have borne a greater share of the burden as a policy matter; the judiciary is not institutionally fitted to undertake such an inquiry." 967 F.2d at 656.

Of course there are limits. One can imagine provisions that, viewed in isolation, provide an excellent match of benefit with burden, but that also supply identical benefits to a host of similarly situated entities. The entities to which Sallie Mae compares itself, however, are distinctly different. On the one hand, there are non-profits and state agencies. But these entities already are exempt from state and local taxation (to take Sallie Mae's most salient benefit) by virtue of special attributes that Sallie Mae does not possess. Without a tax exemption, Sallie Mae would occupy the ordinary position of a for-profit firm in competition with non-profits—an unenviable position, to be sure, but not an unconstitutional one. (While as a matter of policy Congress has gone some way to levelling the playing field for non-profits and for-profits, and has restricted the ability of non-profits to compete with for-profit entities by

means of the tax on unrelated business income, see 26 U.S.C. §§ 511–15; *United States v. Am. College of Physicians*, 475 U.S. 834, 837–38, 106 S.Ct. 1591, 1593–94, 89 L.Ed.2d 841 (1986), no one has ever suggested that this tax is constitutionally mandated.) The other competitors that Sallie Mae points to as better treated are for-profit banks in the business of making guaranteed student loans. But these firms plainly do not enjoy the exemption from state and local taxes. Thus, while the courts must impose limits on the possible manipulation of benefits and burdens to prevent the unfair singling out that the takings clause is in part aimed to prevent, whatever mismatch exists here is beyond what the judiciary is "institutionally fitted" to condemn.

■ To the extent that the above features leave the matter in doubt, the fee's solely prospective application—to loans acquired by Sallie Mae after the effective date of the amendment, August 10, 1993—resolves them. Purely prospective burdens do not present the same constitutional difficulties as retroactive ones, as the affected parties can take measures to protect themselves against, or at least mitigate, the otherwise resulting loss. See *In re Thompson*, 867 F.2d 416, 422 (7th Cir.1989); cf. *United States v. Security Industrial Bank*, 459 U.S. 70, 82, 103 S.Ct. 407, 414–15, 74 L.Ed.2d 235 (1982) (construing bankruptcy provision as affecting only property rights acquired after enactment in order to avoid the taking issue that would otherwise have been presented). Except for the loans acquired pursuant to its responsibility to act as a lender-of-last-resort, Sallie Mae evidently may cease acquiring loans altogether. Indeed, Sallie Mae itself, in the context of arguing that its advantages as a government-sponsored entity are trivial, says that it is free to abandon its special status and turn its business over to a conventional, for-profit firm. If so, its shareholders could avoid both the fee *and* the burdens borne as lender-of-last-resort. More generally, Sallie Mae does not appear to argue that its charter restrictions prevent it from migrating into deployments of its physical and human capital that would be indisputably free of the 0.3% fee and roughly as profitable as its business before imposition of the fee.

We must reject the claim that the offset fee imposes an unconstitutional taking on Sallie Mae.

### Application to Securitized Loans

On the second substantive issue we again face jurisdictional questions. The Secretary makes a series of interrelated arguments on the subject. First, he claims that the Winnick and Baxter letters defining "hold" were not final agency action. Even assuming they were, he contends that, by the time of the district court decision, the interpretation was moot because Sallie Mae had undertaken a securitization transaction that was different from the hypothetical presented to the Department. Finally, the Secretary asserts that the letters' interpretation of § 439(h)(7) is not ripe for review because the Department never had an opportunity to consider the particulars of the transaction actually carried out by Sallie Mae.

■ Under the Administrative Procedure Act we can review only final agency action. 5 U.S.C. § 704; *Franklin v. Massachusetts*, 505 U.S. 788, 796, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992). Though the overwhelming bulk of agency correspondence is probably non-final, in *National Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689 (D.C.Cir.1971), we found final action in an interpretation of law set forth in a letter from the Administrator of the Wage and Hour Division of the Department of Labor. "[1] When a published interpretation represents the initial views of an agency, approved by the Commission or person who heads the agency, [2] when it is the product of the process provided by the agency for taking into account the position of agency staff as well as the outside presentation, [3] when the interpretation is not labeled as tentative or otherwise qualified by arrangement for reconsideration," then it is final for purposes of judicial review. *Id.* at 702.

■ Here all three criteria are satisfied. The Secretary of Education endorsed the interpretation of § 439(h)(7) set forth in the two letters. In the Winnick letter, the Acting General Counsel of the Department said that he was communicating the position of the Secretary. In the Baxter letter, the Department's Deputy General Counsel wrote "we have concluded that our initial view was correct and that the offset fee would be owed on loans transferred to a business trust," evidently referring to the position of the Secretary and the Department in the initial letter. And when Sallie Mae's representatives met with the Secretary, he stood by the Department's interpretation. There is no doubt that the position stated in the letters was a "marching order[ ]" valid for all of the Department. *NRDC v. Thomas*, 845 F.2d 1088, 1094 (D.C.Cir.1988) (holding that director of relevant component unit could issue memorandum constituting final agency action even though he was a subordinate agency official).

The position was stated unequivocally. Although the Winnick letter said "[w]e will be glad to review the details of any particular transaction that Sallie Mae believes is an outright sale rather than a continued holding," the preceding paragraphs made it abundantly clear that, on the issue of whether any direct or indirect financial interest was enough to hold a loan, and on the issue of whether, in a "typical securitization" the assets in question would cease to be "held" by Sallie Mae, the Secretary had made up his mind. The second letter and the meeting with the Secretary confirmed that the Department's view was definitive.

Finally, the Winnick letter and the later developments overwhelmingly suggest that the Department's interpretation was the product of agency deliberation informed by Sallie Mae's position. Assuming the Winnick letter may have been inadequate on this score, it was followed by Sallie Mae's letter and legal memorandum, the meeting with Deputy General Counsel Baxter, the Baxter letter, and, finally, the meeting with the Secretary himself. It seems inescapable that the agency had adequate opportunity to deliberate, to bring staff expertise to bear, and to consider the implications of its interpretation, and that it did so.

■ The Secretary's mootness suggestion rests on the point that the securitizations actually performed by Sallie Mae have dif-

fered in some detail from those described to him in the communications leading to his letter determinations. Accordingly, he says, the district court's judgment was merely a "ruling in the abstract." The conclusion does not follow from the premise. If the actual securitizations differed so drastically from the one outlined to the Secretary as to suggest that in the future Sallie Mae would not pursue securitizations with substantially the same characteristics that elicited the Secretary's analysis, the argument would make sense. But the Secretary makes no claim that the differences are great enough to carry any such implication.

■■■■ The Secretary finally argues that Sallie Mae's claim is not ripe. Recognizing that ripeness characteristically turns on whether the issues are fit for judicial review and whether the plaintiff will suffer hardship from delay of adjudication, see *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967), the Secretary claims that Sallie Mae will suffer no hardship. This conclusion is clear, he says, from the fact that Sallie Mae went forward with securitizing loans even before the district court ruled.

■■■■ In the regulatory context, the conventional treatment of hardship focuses on the dilemma of a party that must either incur the costs of obeying a regulation it believes invalid, or violate the command and run the risk of significant penalties. See *id.* at 152–53, 87 S.Ct. at 1517–18. Where conformity to a regulation would impose a large capital cost and no material operating costs, of course, a firm that conformed to the mandate could well be said to have mooted its hardship. A one-time capital investment will have been made and there will be no more hardship to be suffered. For a regulation that imposed operating costs but no capital costs, however, the actual choice of the firm to comply or not comply during the period of legal uncertainty would not, standing alone, materially contradict the claim of hardship. Compliance or non-compliance with this type of regulation would show only that the firm

had chosen the least bad option in the light of the risks.

A legally disputable fee presents a firm with comparable trade-offs. Most obviously, a firm's choices would include (1) persisting in conduct that is plainly subject to the fee, (2) abandoning any semblance of that conduct, and (3) devising substitutes for the burdened conduct that, in the firm's opinion, reduce the probability that the fee will apply but that presumably entail some cost—for otherwise the firm would have employed the substitutes anyway. For a fee that does not require a one-time, lump-sum payment, but rather is calculated on a continuing basis as a percentage of the firm's volume of business, the firm's choice among these possibilities is as uninformative about the hardship created by the prolongation of legal uncertainty as the choice made by the firm subject to an operating-costs-only regulation.

Here the case is slightly more complicated. Sallie Mae evidently would regard securitization as desirable for *part* of its portfolio even in a world completely free of the offset fee. Of the over four billion dollars in loans now securitized, it had acquired $800 million before the effective date of the statute; as they were not subject to the offset fee under any reading of § 439(h)(7), avoidance of the fee could not have been any part of Sallie Mae's motivation. Indeed, Sallie Mae's vice president and controller explained that (1) securitization is part of the firm's effort to "demonstrate to the equity market its ability to finance its business cost effectively as a state chartered corporation," Overend Decl. at 12, but that at the same time (2) securitization entails higher transaction costs than those incurred in Sallie Mae's "traditional debt issues," *id.* We do not claim to fully understand the nuances of Sallie Mae's strategy (which were not central to development of the record), but it is obvious that, at the margin, the risk of the offset fee alters the balance between conventional debt and securitization. Sallie Mae's securitization of $3.2

billion in loans subject to a risk of the fee shows only that, given its appraisal of the costs and benefits of the alternatives available to it, it regarded $3.2 billion as the optimal amount. By the same token, its uncontradicted allegations show that the risk is a factor in that balance, so that its continued exposure to the risk alters its conduct in a costly way. That is enough.

■ Accordingly we reach the merits of Sallie Mae's attack on the Department's ruling that the term "holds" includes "any loan in which Sallie Mae holds a direct or indirect financial interest." Winnick letter at 2. We must uphold the agency if its interpretation flows from the unambiguous meaning of the statute or is a reasonable construction of ambiguous statutory language. See *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

■ Sallie Mae starts with something of an ace. Although the Higher Education Act does not define the verb "holds," the precise word used in § 439(h)(7), it does define the noun "holder" for purposes of the Act, specifically as "an eligible lender who owns a loan." 20 U.S.C. § 1085(i). Although it is possible that the definition applies *only* when the word appears in the form of a noun, such a reading is not on its face very plausible. Cf. *United States v. Granderson,* 511 U.S. 39, 46, 114 S.Ct. 1259, 1264, 127 L.Ed.2d 611 (1994) (noting "textual difficulty" in party's proposing to give different constructions to term used both as a noun and a verb in the same statutory proviso). But see *Indiana Michigan Power Co. v. Dep't of Energy,* 88 F.3d 1272 (D.C.Cir.1996) (finding different meaning where context supported such an interpretation). This is especially the case where, as here, the common meaning and the statutory definition of the word overlap. For instance, Webster's Third New International Dictionary Unabridged 1078 (1961), defines the verb "to hold" as "to retain in one's

keeping: maintain possession of: not give up or relinquish: possess, have." Nothing in the common meaning of "to hold" belies resort to the statutory definition of "holder" to illuminate the meaning of the verb form. Nor does *Webster's* include among the meanings of "hold," occupying two long columns of fine print, anything remotely resembling the Secretary's idea that one holds anything in which one has any financial interest.

The Secretary offers a structural argument for supposing that, even though a "holder" means an "owner," "holds" does not mean "owns." He points to a specific provision in the statute that, he argues, draws a distinction between the two:

> Loans made by eligible lenders in accordance with this part shall be insurable by the Secretary whether made from funds fully *owned* by the lender or from funds *held* by the lender in a trust or similar capacity and available for such loans.

20 U.S.C. § 1076 (emphasis added).

We think the argument affords him little help. First, the provision does not relate to the context in which the term "holder" in the general statutory definition is linked with the term "holds" in § 439(h)(7), namely, the task of *identifying* the "holder" of, or who "holds," a loan. Instead, the section refers to the distinct issue of the *type* of ownership that is permissible for student loans, namely, both "full[ ]" ownership and ownership of only legal title, without the beneficial interest. Second, although the section employs the terms "owned" and "held" independently, it does so in a context where that drafting choice makes no difference whatever: the point of § 1076 is simply to make clear that even a person holding (or owning) funds as trustee is an eligible buyer.

Of course the section recognizes that there is some elasticity in the idea of ownership, stretching (at least) from "full[ ]" legal and equitable title to legal title, but that is completely different from breaking down the apparent statutory equation of holding and owning. We will return to the issue of what

"owns" means shortly in a discussion of the flexibility left to the Secretary under our reading of § 439(h)(7).

The Secretary also contends that Sallie Mae, through a representation made in its Registration Statement, admits to holding securitized loans under its own view of the meaning of "hold." A lender may make a consolidation loan only if that lender "holds" a student loan, or is approached by a borrower who certifies that none of the current holders of the borrower's existing loans offers consolidation loans. See 20 U.S.C. § 1078–3(b)(1)(A). Since Sallie Mae's Registration Statement states that it will continue to make consolidation loans available to borrowers whose loans have been transferred to the trust, Registration Statement at 24, the Secretary argues that Sallie Mae must believe that it will still "hold" those loans. But Sallie Mae's representation carries no such implication. Sallie Mae can relinquish ownership of loans when they are put into the trust, but then repurchase them when it wishes to make consolidation loans; evidently it does exactly that.

As to legislative history, the litigants have pointed to none shedding any direct light on the meaning of "holds," "owns," or "holder," and we have discovered none on our own.

In seeking to break out from the apparent statutory equation of holding and owning, the government notes that Congress is not bound by the statutory canon that the same word used in closely related provisions of a statute should be expected to have the same meaning. See *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 608–09, 76 L.Ed. 1204 (1932). It therefore turns to broad arguments about the purpose of the statute, aimed at showing that Congress could not have intended that the term "holds" in § 439(h)(7) be governed by § 1084(i)'s definition of "holder." In its core form, the argument is an assertion that, if the Secretary's view is rejected, the government might collect less revenue than Congress had hoped. Obviously this goes much too far. If accepted, it would allow the government to assess the fee even if Sallie Mae completely dropped its current business and instead dedicated itself wholly to the provision of services related to student loans.

Further, the Secretary's exclusive focus on revenue assumes that Congress's *primary* goal was ipso facto its only goal. "But no legislation pursues its purposes at all costs." *Rodriguez v. United States,* 480 U.S. 522, 525–26, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987). We see no evidence that § 439(h)(7) was the product of monomaniacs. Congress clearly tempered its desire for revenue with a careful selection of means— imposition of a fee on Sallie Mae proportional to the dollar amount in loans that Sallie Mae "holds" (and acquired after the date of enactment). That choice must also be honored.

A closely related argument is the Secretary's suggestion that, in the absence of his interpretation, Sallie Mae would be able to "evade" or "avoid" the fee. See Baxter letter at 2, 3. The two deserve separation. Persons are permitted to structure their affairs so as to reduce the incidence of taxation. See *Bullen v. Wisconsin,* 240 U.S. 625, 630–31, 36 S.Ct. 473, 474–75, 60 L.Ed. 830 (1916) (Holmes, J.). They may "avoid" the payment of burdens that would flow from persisting in the status quo. They typically may not, however, "evade" burdens, i.e., escape a tax by engaging in sham transactions that preserve the economic reality of the relationship that Congress has burdened.

It seems doubtful if even the Secretary seriously thinks that, to prevent evasion, it is necessary to define "holds" as embracing "any loan in which Sallie Mae holds a direct or indirect financial interest." One of the purposes of Sallie Mae's enabling legislation was to enrich the supply of funds for student loans by enabling lenders to borrow capital from Sallie Mae using student loans as security. See 20 U.S.C. §§ 1087–2(a), 1087–2(d)(2). If the Secretary's formula were

right, all loans in which Sallie Mae held a security interest would be subject to the offset fee, a logical application that the Secretary nowhere asserts.

In the pertinent letters, the Department also offered more restrained analyses of the underlying theory behind the fee:

> The offset fee is intended to partially repay the taxpayers, in the form of the FFEL [Federal Family Education Loan] program fund, for the benefits Sallie Mae has received from its statutory role in the FFEL program. In addition, the fee is intended to help 'even the playing field' in the student loan secondary market by reducing the financial advantage Sallie Mae has over other secondary markets because of its status as a Government Sponsored Enterprise.

Winnick letter at 1.

These ideas of implicit reciprocity are, of course, akin to the very grounds that we considered earlier in rejecting Sallie Mae's argument that the fee effected a taking of its property. The Secretary does not explain why accomplishment of these purposes cannot be achieved within the notion of ownership that the statute itself employs. Moreover, other parts of the Secretary's statements engage in an analysis suggesting reconciliation of those purposes with the idea that § 439(h)(7) covers only loans owned by Sallie Mae. The Baxter letter, for example, in analysing the hypothetical securitization transaction, contends that Sallie Mae should pay the fee because the holders of "equity" certificates in the trust receive a "return ... limited to principal and interest and they do not share in any final profits of the trust." Baxter letter at 1. Here the focus seems to be on which party has a claim to residual profits, which is characteristically seen as the—or at least an—essential attribute of ownership. See, e.g., Henry Hansmann, "Ownership of the Firm," 4 J.L. Econ. & Org. 267, 269 (1988). Had the Department developed this line of reasoning, it might have arrived at a permissible interpretation of the statute. The rights necessary to own-

ership for these purposes might, of course, be different from simple legal title.

The assertion that Sallie Mae must be deemed to "hold" any loan in which it "holds a direct or indirect financial interest" is flawed not only qualitatively (sweeping up loans that Sallie Mae cannot in any normal sense of the word be said to own) but also quantitatively. If Sallie Mae had a 5% equity interest in a corporation that owned a loan, but no other financial or control interest in the corporation, the Secretary's interpretation would subject the entire loan to the fee. Without addressing whether the Secretary might deem Sallie Mae to be the holder of any part of the loan under those circumstances, we can say firmly that he could not treat it as the holder of 100%.

■ Because the Secretary considered Sallie Mae's securitizations under a flawed understanding of the word "holds" as used in § 439(h)(7), we cannot sustain his conclusion that a securitized portfolio is held by Sallie Mae. If the offset fee is to be applied to loans securitized by Sallie Mae under the sort of arrangement proposed by Sallie Mae in its letters to the Department, or later carried out in practice, this must occur (if at all) within the statutory terms defining "holder" as equivalent to "owner."

\* \* \* \* \* \*

We affirm the district court in its rejection of Sallie Mae's claim that the fee effected a taking of Sallie Mae's property. We affirm the district court's judgment striking down the Department's ruling that § 439(h)(7) embraces any loan in which Sallie Mae "holds a direct or indirect financial interest." Because the Department has not applied a correct understanding of "holds" in determining § 439(h)(7)'s possible coverage of loans securitized by Sallie Mae, we remand the case to the district court for it to remand the matter to the Secretary.

*So ordered.*

WALD, Circuit Judge, concurring.

I agree with the majority that the fee imposed on loans held by Sallie Mae under 20 U.S.C. § 1087–2(h)(7) (1994) does not constitute a taking, that the Department's interpretation of the fee provision as applying to any loan in which Sallie Mae "holds a direct or indirect financial interest" is impermissibly broad, and that we must therefore remand for the Department to apply a correct definition of "holds" in determining whether and how the fee provision applies to loans securitized by Sallie Mae. I write separately out of an apprehension that the majority's opinion suggests at times an unduly restrictive definition of "holds" that focuses excessively on the extent to which Sallie Mae retains an equity stake in the loans or the entity to which it transfers the loans. While I agree that the extent of Sallie Mae's equity stake in the loans is significant, I believe that other factors may be equally relevant in determining whether Sallie Mae could legitimately be said to "hold" the loans. These factors include, for example, the degree to which Sallie Mae can control the loans, whether Sallie Mae continues to receive financial benefits from the loans, whether Sallie Mae has a right to buy back the loans, and whether Sallie Mae can control the trust or corporation to which it transfers the loans. Emphasizing these factors is not incompatible with the majority's equation of "holds" with "owns," since these factors are often viewed as indicia of ownership. *See, e.g., United States v. 526 Liscum Drive,* 866 F.2d 213, 217 (6th Cir.1989) (holding that in order to have standing to challenge forfeiture of property, where evidence indicates claimant may be nominal owner, claimant must "present evidence of dominion and control or other indicia of true ownership," not merely legal title); *S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Bldg. 1 Hous. Dev. Fund Co., Inc.,* 608 F.2d 28, 37 (2d Cir.1979) (holding that under public housing program HUD possesses "almost all of the indicia of actual ownership except the status of title holder of record," where HUD controls planning, development and operation of housing project). Indeed, the majority itself notes that the "rights necessary for ownership for [purposes of determining the applicability of the fee provision] might … be different from simple legal title." Majority opinion at 409.

ORDER ON REHEARING

March 11, 1997

Sallie Mae petitions for rehearing, noting that because the district court held that the statute did not embrace securitized loans, that court should not have addressed the constitutionality of the fee as applied to such loans. See *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). We agree. Similarly, as we rejected the Secretary's grounds for applying the fee to securitized loans, nothing in our decision should be taken as expressing any opinion on the constitutionality of the fee in that context, nor on whether there is any distinction, for constitutional purposes, between securitized loans and ones "held" by Sallie Mae in the most conventional sense of the term.